## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO
Bankruptcy Judge Thomas B. McNamara

| | |
|---|---|
| In re:<br><br>MICHAEL GIBSON,<br><br>Debtor. | Bankruptcy Case No. 22-14730 TBM<br>Chapter 7 |
| HARVEY SENDER,<br><br>Plaintiff,<br><br>v.<br><br>ELLA CONEY,<br><br>Defendant. | Adv. Pro. No. 24-01018 TBM |

## MEMORANDUM OPINION AFTER TRIAL

### I.    Introduction.

Michael Gibson (the "Debtor") formerly served in the United States Army.  He was injured in the line of duty and, when he returned home, could no longer do his military job. His marriage broke up and he became embroiled in a custody dispute.   Life was difficult. But instead of regrouping and restarting, the Debtor sought revenge, filing a frivolous lawsuit against his ex-wife, the man with whom he believed she was having an affair, and others in state court.  One of the defendants in the lawsuit (the man alleged to have had an affair with the Debtor's ex-wife) sought and was awarded attorneys' fees and costs. The Debtor appealed the award, unsuccessfully, and a further award was entered against him.   Throughout the case and appeal, the Debtor resisted the defendant's efforts to obtain discovery and collect the judgment from him.

The Debtor, unemployed, facing collection, and owing money to his mother, Ella Coney ("Ms. Coney") for loans made in connection with the custody dispute, filed his voluntary petition for relief under Chapter 7 of the Bankruptcy Code on December 2, 2022 (the "Petition Date").  Before he did so, the Debtor signed a deed of trust in favor of Ms. Coney.  In addition, just a few days before his filing, the Debtor borrowed money from a credit union and transferred the proceeds to Ms. Coney.  After Harvey Sender (the "Trustee") was appointed as Chapter 7 trustee in the case, he "investigate[d] the financial affairs of the Debtor" and concluded that the transfers to Ms. Coney constituted property of the Debtor's estate which he was required to "collect and reduce to money."

1

11 U.S.C. § 704(a)(4) and (1).  The Trustee, therefore, filed a Complaint (Docket No. 1) asserting claims to avoid, recover, and preserve the transfers, thereby commencing this Adversary Proceeding against the Defendant

During the course of this Adversary Proceeding, the Court denied Ms. Coney's motion to dismiss the claims against her and further denied her motion for summary judgment after determining that there existed questions of fact about the Trustee's claims that had to be decided at trial.  The Court then denied a second motion to dismiss for lack of jurisdiction, filed May 12, 2025, minutes before the trial was set to commence, after determining that Ms. Coney had voluntarily consented to the Court's exercise of jurisdiction over the claims asserted by the Trustee in the Adversary Proceeding.

Ms. Coney, inexplicably, failed to appear for trial on May 12, 2025, but was represented by counsel.  Notwithstanding Ms. Coney's failure to appear, the Court proceeded with the trial.  Having now considered the evidence, the Court rules in favor of the Trustee with respect to most (but not all) of his claims.

## II.      Jurisdiction and Venue.

This Court has jurisdiction to hear and determine the claims in the Complaint pursuant to 28 U.S.C. § 1334.  The claims are core proceedings under 28 U.S.C. §§ 157(b)(2)(A) (matters concerning administration of the estate), (b)(2)(B) (allowance or disallowance of claims against the estate), (b)(2)(F) (proceedings to determine, avoid, or recover preferences), (b)(2)(H) (proceedings to determine, avoid, or recover fraudulent conveyances), and (b)(2)(O) (other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor relationship).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  Further, as the Court explained in detail in the oral ruling issued May 12, 2025, the Defendant consented to the Court's exercise of jurisdiction over the matter.  (Docket No. 84.)

## III.      Procedural Background.

## A.      The Debtor's Main Bankruptcy Case.

The Debtor filed for protection under Chapter 7 of the Bankruptcy Code[1] on December 2, 2022, commencing *In re Gibson*, Case No. 22-14730 (Bankr. D. Colo.) (the "Main Bankruptcy Case.").[2]  (Ex. 63 at 1-8.)

---

[1]      All references to the "Bankruptcy Code" are to the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq*.  Unless otherwise indicated, all references to "Section" are to sections of the Bankruptcy Code.

[2]      The Court uses the convention "Main Case Docket No. ___" to refer to documents filed in the CM/ECF system in the Main Bankruptcy Case: *In re Gibson*, Case No. 22-14730 (Bankr. D. Colo.) (the "Main Bankruptcy Case.").  The Court uses the convention "Docket No. ___" to refer to documents filed in the CM/ECF system in this Adversary Proceeding.

B.      **The Adversary Proceeding**.

On January 25, 2024, the Trustee, through counsel, filed the Complaint against Ms. Coney.  (Docket No. 1, the "Complaint.)  In the Complaint, the Trustee asserts eight claims for relief.  In the first claim for relief, the Trustee seeks to avoid post-petition transfers of property of the Debtor's bankruptcy estate to Ms. Coney pursuant to Section 549.  In the second claim for relief, the Trustee seeks to avoid pre-petition transfers of property of the estate to Ms. Coney pursuant to Section 547(b).  In the third claim for relief, the Trustee seeks to avoid pre-petition transfers of an interest of the debtor in property, or obligations incurred by the Debtor made within two years before the Petition Date, asserting that the Debtor made such transfers with actual intent to hinder, delay, or defraud the Debtor's creditors under Section 548(a)(1)(A).  In the fourth claim for relief, the Trustee seeks to avoid transfers of interests of the Debtor in property to Ms. Coney, or obligations incurred by the Debtor to Ms. Coney, that were made or incurred within two years before the Petition Date, asserting that the Debtor made such transfers to Ms. Coney in exchange for less than reasonably equivalent value at a time when the Debtor was insolvent or that the Debtor became insolvent as a result of the transfers under Section 548(a)(1)(B).  In the fifth claim for relief, the Trustee seeks to avoid pre-petition transfers to Ms. Coney pursuant to COLO. REV. STAT.§ 38-8-105(1)(a) and Section 544(b), asserting that the transfers were made with intent to hinder, delay, or defraud the Debtor's creditors.  In the sixth claim for relief, the Trustee seeks to avoid pre-petition transfers to Ms. Coney pursuant to COLO. REV. STAT.§ 38-8-105(1)(b) and Section 544(b), asserting that the transfers were not made by the Debtor in in exchange for reasonably equivalent value from the Defendant.  In connection with  the first through sixth claims for relief, the Trustee seeks to recover such transfers or the value thereof (assuming such transfers are avoided) to Section 550.  With respect to the first through seventh claims for relief, the Trustee seeks an "award of attorney's fees and costs as provided by law and/or agreement.  In the seventh claim for relief, the Trustee seeks to preserve avoided pre-petition transfers for the benefit of the Debtor's bankruptcy estate pursuant to Section 551.  And, in the eighth claim for relief (erroneously labeled "Seventh Claim for Relief"), the Trustee seeks disallowance pursuant to Section 502(d) of any claim filed by Ms. Coney against the Debtor's estate unless she has turned over any amount for which she is found liable based on the Trustee's other claims for relief.  The Trustee also pleads, in the General Allegations section of his Complaint, a claim for entry of judgment for one and one-half [times] the value of the asset transferred or for one and one half [times] the amount necessary to satisfy creditor claims, whichever is less, together with the Trustee's actual costs," pursuant to COLO. REV. STAT.§ 38-8-108.  (Docket No. 1 ¶¶ 94 and 95.)

Ms. Coney, *pro se*, responded to the Complaint by filing "Defendant's Motion to Dismiss" (Docket No. 9, the "Motion to Dismiss"), arguing that the Complaint should be dismissed for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), as incorporated by Fed. R. Bankr. P. 7012.  The Trustee filed a "Response in Opposition to Motion to Dismiss Complaint" (Docket No. 10, the "Objection"), disputing that the Complaint should be dismissed, and Ms. Coney filed "Defendant's Reply in Support of Motion to Dismiss." (Docket No. 11.)  Thereafter, the Court denied the Motion to Dismiss in its "Corrected Order Denying Motion to Dismiss."  (Docket No. 17.)

3

Subsequent to the denial of the Motion to Dismiss, Ms. Coney filed an "Answer to Complaint (Docket No. 19), followed by an "Amended Answer to Complaint." (Docket No. 28, the "Amended Answer.")  The Amended Answer is the operative answer to the Complaint.  On September 17, 2025, the Court (with the parties' input and consent) issued a "Scheduling Order," setting the dispute for a two-day trial commencing on May 12, 2025.  (Docket No. 24.)

Thereafter, the parties engaged in various pre-trial discovery skirmishes. (Docket Nos. 45-54).  As the trial approached, Ms. Coney filed "Defendant's Motion for Summary Judgment"  (Docket No. 56, the "Motion for Summary Judgment").  On April 22, 2025, while the Motion for Summary Judgment was pending, legal counsel entered an appearance on behalf of Ms. Coney (Docket No. 69).  Subsequently, on April 2, 2025, the Court issued an "Order Denying Summary Judgment" (Docket No. 71, the "Summary Judgment Order").  In the Summary Judgment Order, the Court stated:  "Trial on the Complaint and Amended Answer will proceed as scheduled on Monday, May 12, 2025, at 9:00 a.m."

At 8:12 a.m. on May 12, 2025, less than an hour prior to the time that trial was set to commence, counsel for Ms. Coney, on Ms. Coney's behalf, filed "Defendant Ella Coney's Motion to Dismiss Under Fed. R. Civ. P. 12(b)(1)" (Docket No. 82, the "Second Motion to Dismiss"), arguing therein that the Court lacked jurisdiction to determine the claims set forth in the Complaint and that Ms. Coney had not consented to the Court's exercise of jurisdiction.

## C.    The Trial.

The Court commenced the trial on the Complaint on May 12, 2025. Ms. Coney's lawyer and the Debtor appeared, but Ms. Coney did not.  Her counsel noted that he had filed the Second Motion to Dismiss and further stated that he understood Ms. Coney had checked herself into a medical facility and would not be able to appear at trial. (Docket No. 84.)  Notwithstanding Ms. Coney's absence, the Court heard arguments from the parties about the Second Motion to Dismiss, after which it made an oral ruling from the bench.  In its ruling, the Court determined that Ms. Coney had consented, numerous times, to the Court's exercise of jurisdiction over the claims in the Complaint and denied the Second Motion to Dismiss.  (*Id.*)  Thereafter, the Court requested that counsel address Ms. Coney's absence from the trial.

Legal counsel for Ms. Coney requested that the Court continue the hearing until the next day counsel to obtain admissible evidence about Ms. Coney's whereabouts and condition.  After hearing from counsel for the Trustee, the Court set the path forward, ruling that the Court would adjourn the proceeding until the next morning at 9:00 a.m. The Court further ruled that, prior to or at the reconvened hearing, Ms. Coney would be required to submit admissible evidence (which might include medical records and affidavits or, preferably, testimony from a doctor or from Ms. Coney addressing her health status on May 12, 2025, and subsequently) regarding her whereabouts and any impediments which prevented her from appearing at the trial on May 12, 2025, and, if applicable, any impediments which might prevent her from appearing at the trial as continued.  The Court warned that, in the absence of an evidentiary record that

supporting the contention that Ms. Coney was or remained incapacitated, checked into a medical facility, and unable to function, the Court might be inclined to proceed with the trial without the Ms. Coney's being present.  (*Id.*)

When the Court commenced the proceedings the following morning, May 13, 2025, Ms. Coney again failed to appear.  Legal counsel for Ms. Coney moved to continue the trial, while Trustee moved for entry of default based on Ms. Coney's failure to attend.  After hearing testimony from the Debtor and arguments addressing both parties' positions with respect to proceeding to trial, the Court issued an oral ruling denying the request to continue the trial and denying the motion for default.  Thereafter, the Court proceeded to conduct the trial in Ms. Coney's absence.

At the trial, the Court heard opening statements from counsel for the Trustee and counsel for Ms. Coney, followed by the testimony of three witnesses:  Patrick Gillette, Harvey Sender, and Michael Gibson.  The Court also admitted Trustee's Exhibits: 1 through 11, 13, 14, 16, 18, 19 (first two paragraphs only), 20 through 22, 23 (Exhibit 10 to Complaint (Docket No. 1) was substituted because Exhibit 10 contains recording information omitted from the version of the exhibit that was marked for trial), 26, 27, 30, 31, 33, 34, 36, 37, 44, 46, 57 (check to Michael Gibson only), and 63 through 66; and Ms. Coney's Exhibits: C through I and L.  After the close of evidence, the parties requested to submit their closing arguments in writing, which request the Court granted as follows:

> The parties shall submit written closing arguments by no later than **June 13, 2025.**  The Court encourages the parties to address each of the elements of all of the Trustee's claims with citations to the factual record and supporting law. With respect to damages and/or remedies, the Court encourages the parties to address with specificity the amount and methodology for calculation of damages, if any, and/or the imposition of remedies.  If either party wishes to submit a rebuttal to the other's closing argument, such rebuttal must be submitted by no later than **June 27, 2025**. In due course, after consideration of the evidence and the parties' arguments, the Court will issue either an oral or written ruling.

(Docket No. 87.)

**D.    Post-Trial Briefing.**

The Trustee submitted his "Written Closing Argument Following Trial on Complaint" (Docket No. 93) on June 13, 2025.  Ms. Coney initially submitted "Defendant Ella Coney's Proposed Findings of Fact, Conclusions of Law, and Order" (Docket No. 94).  Five days later, however, counsel for Ms. Coney submitted a "Notice of Errata" (Docket No. 95, the "Errata") and another version of "Defendant Ella Coney's Proposed Findings of Fact, Conclusions of Law, and Order" (Docket No. 96).  In the Errata, counsel stated:

> The Undersigned filed the wrong version of Ella Coney's
> Closing Argument. The correct version (version 18247.**14**) is
> being filed. The version that was inadvertently filed was a
> draft version, which was version18247.**4**. The Undersigned
> saw the error when preparing documents to file the
> Undersigned's Notice of Withdrawal.

(Docket No. 94, bolding in original).  "Defendant Ella Coney's Proposed Findings of Fact, Conclusions of Law, and Order" (Docket No. 94).  Thereafter, on June 27, 2025, the Trustee field "Trustee's Rebuttal Closing Argument Following Trial on Complaint" (Docket No. 97), and Ms. Coney filed "Defendant Ella Coney's Rebuttal Response and Reply in Support of her Proposed Findings of Fact, Conclusions of Law, and Order" (Docket No. 98).

The Court, having considered the evidence presented at trial (including the testimony and admitted exhibits) and the arguments presented by the parties in their post-trial submissions, determines that the dispute is now ripe for decision.

## IV.   <u>Findings of Fact.</u>

The Court makes the following findings of fact under Fed. R. Civ. P. 52(a)(1), as incorporated by Fed. R. Bankr. P. 7052, based upon the evidence presented at the trial (including testimony and admitted exhibits).[3]  To the extent that the Court's identification of the foregoing Procedural Background is factual in nature (that is, identifying what occurred in the Main Case and this Adversary Proceeding), the Court also incorporates the foregoing Procedural Background as part of the Court's factual findings.  In addition, the Court takes judicial notice of the Docket in the Main Case and this Adversary Proceeding.  *See St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir. 1979) (court may *sua sponte* take judicial notice of its own docket).

## A.   <u>The Debtor.</u>

### 1.   <u>Military Service.</u>

The Debtor, Michael Gibson, was a member of the United States Army for 23 years, attaining the rank of Master Sergeant, and was injured in the line of duty. Because he was injured, when he returned to the United States from a tour of Afghanistan, he could not do his military job, so he began the process of leaving the military.  He officially retired in the summer of 2024, with an honorable discharge.

### 2.   <u>Pre-Petition Litigation, Judgment Against the Debtor, and Debtor's Obstruction of Collection Efforts.</u>

---

[3]     This Order states findings of fact specially and conclusions of law separately, as required by Fed. R. Civ. P. 52(a)(1), as incorporated by Fed. R. Bankr. P. 7052.  *See S.E.C. v. Anselm Explor. Co.*, 936 F. Supp. 2d 1281, 1285 n.6 (D. Colo. 2013).  "Any finding of fact more properly deemed a conclusion of law, or any conclusion of law more properly deemed a finding of fact, shall be more properly characterized." *Id.*  See also *Kolbe v. Endocrine Servs., P.C.*, 2022 WL 970004 at *3 (D. Colo. Mar. 31, 2022) (same).

Before he retired, starting in 2014, the Debtor became embroiled in a divorce and custody dispute with his now-former wife, Michelle Clare. By 2017 and 2018, the dispute was still going strong, and was costing the Debtor significantly. In addition to the divorce and custody dispute, the Debtor filed a lawsuit in the Arapahoe County Colorado District Court (the "State Court"), styled: *Gibson v. Clare et al.*, Case No. 2017-CV-227 (Arapahoe Cnty. Dist. Court, Colorado) (the "State Court Litigation") against Ms. Clare, Patrick Callahan (whom the Debtor believed to be having an affair with Ms. Clare) and others. In the State Court Litigation, the Debtor asserted claims for intentional infliction of emotional distress and other common law claims.

The State Court Litigation did not go well for the Debtor. Patrick Gillette, counsel for Mr. Callahan, filed a motion to dismiss the claims against his client, which was granted. Other defendants also filed motions to dismiss. Those too were granted.

On March 15, 2018, the State Court entered an "Order Regarding Plaintiff John Callahan's Motion for Attorney's Fees and Costs, awarding Mr. Callahan $5,116.50, plus eight percent per annum interest compounded annually (the "March 2018 Fee Award"), for the attorney's fees and costs incurred in connection with the State Court Litigation. After that, as Mr. Gillette described it, "the case kind of bounced back and forth" between the State Court and the Colorado Court of Appeals, which decided issues related both to the merits of the March 2018 Fee Award and the finality of the March 2018 Fee Award.

During pendency of the appeal in the Colorado Court of Appeals, Mr. Gillette represented Mr. Callahan in attempting to collect the March 2018 Judgment from the Debtor. On March 26, 2018, he wrote to the Debtor (who did not have legal representation) stating:

> Mr. Gibson:
>
> Do you intend to pay Mr. Callahan's attorneys' fee judgment against you voluntarily?
>
> If not, we intend to serve you with post-judgment discovery in order to collect. In that event, please advise whether you will sign a waiver and acceptance of service of such discovery.

(Ex. 2.) Mr. Gibson responded:

> Patrick,
>
> Understanding that the court was obligated to award your fees under rule, I do not intend to pay the fees voluntarily until after the court of appeals has decided what to do with the court's dismissal. As I have said many times, the court should have allowed at least one amendment before dismissal. If the court of appeals finds the same your order will be vacated.

> Thus, I sincerely wish you would wait until disposition from the COA. If you choose not to, I will not sign a waiver and acceptance of service.

(*Id.*) The Debtor did not obtain a stay pending appeal, so Mr. Gillette proceeded to seek discovery in furtherance of his collection efforts, including efforts to schedule a deposition of the Debtor. On April 17, 2018, Mr. Gillette sent an email to Debtor in which he stated:

> Mr. Gibson:
>
> I write to follow up on my email, below, regarding the scheduling of your deposition. I have also called you at the phone numbers you have previously provided, but my calls go straight to voice mail, and your voice mail box has not been set up to receive messages.
>
> Please advise as to your availability for your deposition. If I do not hear from you by close of business tomorrow, I will schedule your deposition for a date and time of my own choosing.

(Ex. 3.) The same day, the Debtor responded:

> Your client is still a Defendant in this matter Patrick and you will find that your attempts to bully me won't work. I will let you know when I am available, if at all, and if you don't like that answer Patrick file a motion to compel.

(*Id.*)

Later that afternoon, Mr. Gillette wrote:

> Mr. Gibson:
>
> No one is attempting to bully you. It is quite the other way around.
>
> Since you will not cooperate in the scheduling of your own deposition, we will notice it without your input.

(Ex. 4). And the Debtor responded:

> Dude you should really pump the brakes here - it appears you are attempting to run up your fees. You are the only one trying this nonsense right now cause everyone else knows this case is *not* over. Did you *not* read the COA's order? Surely you don't think I won't object to your subpoena – at which time you *will* need to motion the court for compliance.

> I *won't* be producing any docs or participating in any
> deposition until the Court gives you a *final* dismissal Patrick.
> Thus, you can expect my objection after 14 days from the
> time of service. Good day Patrick.

(*Id.* (italics in original)).

And so it went.  The Debtor did not cooperate in post-judgment discovery.  He objected to or failed to respond to every discovery request.  He seemed utterly disinclined to provide any documents or information about his financial assets and his employment and made the process more laborious than it needed to be.  When the State Court ordered the Debtor to sit for a deposition, the Debtor responded:  "I don't know," to various questions.  And the Debtor was combative in his dealings with Mr. Gilette, attempting to set depositions of his own without following the rules regarding conferral.  (Ex. 5.)  It was only after he was ordered to do so that the Debtor produced some financial documents.

Eventually, the Colorado Court of appeals ruled that the State Court's order dismissing the State Court Litigation as against Mr. Callahan was final, and Mr. Gillette filed a petition for certiorari on that issue with the Colorado Supreme Court.  On July 19, 2019, while the petition for certiorari was pending, the Debtor emailed Mr. Gillette, stating:

> Wow...
>
> A petition for writ of certiorari to the supreme court.
>
> This smells like desperation gentlemen. If the Supreme
> Court even grants Certiorari, which is possible but unlikely,
> you guys are about to spend way more in time and effort
> than the mere $5,000 judgment you want me to pay you is
> worth.
>
> So here's the thing gentlemen, you have a DUTY to inform
> your client that this isn't going to end well. I'm sure you
> already know how its going to end for you Patrick...because I
> already know what you did and you already know what I'm
> *about* to do.
>
> Additionally, your duty includes case resolution at the lowest
> level, as opposed to clogging up the pipeline with the type of
> non-sense that defines this case.  So...perhaps you let your
> egos get in the way and dismissed me simply because I
> didn't graduate from Harvard Law School - oh wait I didn't
> graduate from law school at all, my bad : )
>
> I have cracked your code, however, and what that means is
> that I can, and will, go toe-to-toe with you all day long
> gentlemen.  That said, you should probably start thinking

9

about your exit strategy. Should the Supreme Court deny you Certiorari, as I anticipate, the pain is coming for *you* and *your client*.  If you want to continue to be dismissive, I'll gladly provide you with a list of the names and numbers of all the high priced attorneys that I've already beaten.

I am not going to continue playing this game with you people and you really need to consider whether it not its worth the risk.

Have a nice day Patrick ; )

(Ex. 8, italics in original.)  Mr. Gillette responded the same day:

We are not playing a "game."  We are attempting to extract our client from litigation with you, an angry, vexatious individual who will sue anybody for any reason, justified or not.   Observe that you are the person who sued a magistrate whose ruling you did not agree with, even though the magistrate had absolute immunity from suit. Observe that you are the person who sued his children's day care center because, in an effort fulfill its obligations under the law, the day care center reported signs of potential child abuse to the police.  Observe that you are the person who sued the mother of his children and "promised" her she would "be in court for the next few years" and would be in "financial ruin."  Observe that you are the person who sued his ex-girlfriend's sister, attorney, and boyfriend (my client) over completely falsified allegations of an affair, a conspiracy, etc.

Review the record. It is you who is playing games, and it is you who is dismissive. You are dismissive of the facts, you are dismissive of the law, and you are dismissive of anyone who challenges or disagrees with you.

After dealing with you for two years, it is apparent to me that your only goal is to cause as much pain and suffering as you can by dragging other people through the legal system with frivolous claims, because you somehow believe doing so will alleviate your own pain and suffering.  I can sympathize with the hurt you feel, but not with the way you chosen to deal with it.

I hope some day you will live without anger, or at least if you have anger you learn to deal with it in a constructive manner that does not cause harm to others. Until that day, have a nice weekend.

(*Id.*)  Not quite two hours later, the Debtor replied:

> BaaaaaHaaaaaHaaaaaHaaaaaHaaaaa :)
>
> You were warned dude. The pain is coming

(*Id.*)

The Debtor continued to refuse to provide financial information.  So, Mr. Gillette continued to engage in collection efforts, including conducting a Rule 69 examination into the Debtor's financial affairs.  The Debtor remained uncooperative.  For example, when Mr. Gillette sent an email in late November 2019 proposing multiple dates for when he would schedule a Rule 69 examination in January 2020, the Debtor responded:  "I'm not available in January."  (Ex. 11).

Notwithstanding the lack of progress, Mr. Gillette proceeded with his representation of Mr. Callahan in connection with the State Court Litigation.  Therein, the State Court on January 4, 2022, entered an "Order of Judgment" in favor of Mr. Callahan and against the Debtor.  (Docket No. 18.)  In the Order of Judgment, the State Court awarded Mr. Callahan $17,224.87 for fees and costs associated with the appeal before the Colorado Court of Appeals (the "January 2022 Award").  The State Court did so, after finding, in part:

> For every objection noted by Plaintiff, the Court finds that each and every time entry claimed by Defendant was in direct response to or related to the numerous meritless motions and pleadings filed by Plaintiff.  There is not a single instance of "bad faith" evident from any of the billing entries of Defendant.  To the contrary, but for the Plaintiff's substantially frivolous claims, Defendant would not have incurred any of the attorneys' fees and costs.  The invoice and declarations submitted by Mr. Callahan also establish that the time Mr. Callahan's attorneys spent litigating this case is reasonable.  Their invoice shows that they billed for discrete tasks (as opposed to block billing), did not double-bill for any single item, and devoted all of their billed efforts to the litigation.  Given the results they obtained for their client, the number of hours Mr. Callahan's attorneys billed is reasonable.

(Ex. 18.)

Mr. Gillette obtained transcripts of the judgments evidencing the March 2018 Award and the January 2022 Award and on February 10, 2021, and January 13, 2022, respectively, recorded them in the real property records for the Property in Adams County, Colorado, in an effort to obtain a lien against the Property.  (Ex. 14.)

After recording the documents, Mr. Gillette did not execute on the liens, but attempted to serve the Debtor with post-judgment subpoenas that would compel the

Debtor's testimony at a Rule 69 proceeding.  Such efforts were not fruitful.  The Debtor declined to waive service and would not cooperate in scheduling.  He took the position that the March 2018 Award was not final and that he was not required to participate in post-judgment discovery as a result.

Multiple process servers employed by Mr. Callahan were unable to serve the Debtor with subpoenas compelling his attendance at Rule 69 proceedings.  Therefore, Mr. Gillette came to the conclusion that the Debtor was evading service, and said as much to the Debtor.  (Ex. 16.)  In an email dated December 3, 2021, Mr. Gillette advised the Debtor:

> My client has a judgment against you and does not need to await further court order to serve post-judgment discovery upon you. Please stop wasting my time with your nonsense.
>
> If you are willing to waive and accept service, say so. Otherwise, I will go get an order for substituted service.

(*Id*.)  In fact, Mr. Gillette did file a motion for alternative service, to which the Debtor responded.  In an email dated January 10, 2022, Mr. Gillette noted that his client had rejected the Debtor's settlement offer and wished to determine whether the Debtor would "voluntarily pay the entire amount due (*i.e.*, $24,115.67), with interest through the date of payment."  (Ex. 20.)  He further stated:  "If you advise that you will not pay, or if you do not respond to this email, I will be left to assume that Mr. Callahan must proceed with post-judgment discovery proceedings in order to enforce his judgments against you.."  (*Id.*)  The Debtor responded the next day:

> Hey dude,
>
> As it turn out your $24,115.67 in attorney fees are the exact type of unsecured debt that can be included in bankruptcy proceedings - *and* they do not fall within the few exceptions that make them exempt from discharge.
>
> So, I don't know what you and Laura's evil plan was here but even though you won, you haven't really won anything.  With your judgment, I, Patrick, am bankrupt : )
>
> You are not going to get a dime from me.  So let's get this show on the road shall we.  Or, we can actually open up a real conversation about settling this debt like reasonable people who have a brain in their head.

(*Id.*)

The State Court entered an "Order Re: Motion for Order Authorizing Alternative Service" on January 21, 2022.  (Ex. 21.)  Therein, the State Court set forth the history of the case, noting that the case was presently a post-judgment proceeding in which Mr. Callahan sought to enforce his attorneys' fees and costs judgment and had sought

discovery pursuant to Colo. R. Civ. P. 69, and further noting that "four different process servers have attempted to serve Plaintiff [the Debtor] eleven separate times." (*Id.* at 2)

The State Court concluded that the Debtor's behavior throughout the course of the State Court Litigation was obstructionist and undertaken with the purpose of avoiding paying Mr. Callahan's judgment, stating:

> As an initial matter, the Court would note that that the totality of Plaintiff's behavior and litigation tactics for several years conclusively, and without a doubt, evidences a deliberate and conscious effort to unnecessarily obstruct, frustrate, and engage in the filing of frivolous pleadings and to avoid paying the judgment against him. Plaintiff's conduct has unnecessarily increased the costs of the litigation and caused this Defendant and others to incur attorney's fees to defend against Plaintiff's claims.
>
> Plaintiff's behavior during his last Rule 69 deposition in 2019 is the best evidence to support Defendant's current request for Substituted Service. When Plaintiff sat for a brief post-judgment deposition three years ago, Plaintiff engaged in obstructionist behavior by claiming that he could not recall his Social Security number, his telephone number or his address. . . . . Such gamesmanship is absolutely the best evidence that Plaintiff will do everything he can to not only avoid personal service but thwart Defendant's attempt to collect on the judgment.

(*Id.* at 4-5.) The State Court also concluded that Mr. Callahan had used due diligence to try to personally serve the Debtor, and that such future efforts would likely be to no avail. Therefore, the State Court granted the motion for alternative service, allowing Mr. Callahan to serve Rule 69 discovery on the Debtor by sending documents through both U.S. mail and email. (*Id.*)

So, post-judgment discovery proceeded in the State Court Litigation. On May 18, 2022, the Debtor provided responses to interrogatories propounded by Mr. Callahan. With regard to the Property, the Debtor stated, in part: "The only real estate I own or have any interest in is 9644 E. 113th Ave Henderson, CO." He also stated: "Regarding my current address, I own the premises, the monthly payment is not approximately $1,750, and the mortgage is paid by the renter of the premises." (Ex. 26 at 1.) The Debtor disclosed two financial accounts in his interrogatory responses, stating:

12.   ANSWER: Navy Federal Credit Union, 820 Follin Ln. SE Vienna, Virginia and Rocky Mountain Law Enforcement Federal Credit Union 700 W. 39th Ave, Denver CO 80216.

13.   ANSWER: For the Navy Federal Account the account was opened in approximately 1999, account number 2029814-007, there are no other persons listed on the account, there is roughly $25.00 in this account and it is currently open. For the Rocky Mountain Account it was opened in approximately 2003, account number 2300-1519, there are no other persons listed on this account, there is approximately $15.00 in this account and it is still open. There are no safe deposit boxes for either account.

(*Id.* at 3.) With respect to his financial records and certain debts, the Debtor stated:

24.   ANSWER: I do not maintain financial books or records as I have no need to. I have not used any services to maintain any records either.

25.   ANSWER: I am not due monies from any such persons, firms, partnerships, companies, businesses, corporations, and/or legal entities. To the extent that I owe any such persons, firms, partnerships, companies, businesses, corporations, and/or legal entities, Coney Management and Reality, 2290 Eudora St. Denver 80207 is owed a total of $45,000 by me, as of January 2022.

At some point in the proceedings, the Debtor made an offer to settle his dispute regarding the with Mr. Callahan for $11,000, an amount the Debtor thought was reasonable, but Mr. Callahan declined the offer.

Mr. Gillette testified that his dealings with the Debtor (including, in particular, the message in which the Debtor said that he had "cracked your code") led him to conclude that the Debtor was hiding assets.  The Court agrees with Mr. Gillette's assessment of the matter, and finds that the Debtor's conduct evidences an intention to avoid providing accurate information about his financial circumstances, an intention to avoid paying Mr. Callahan's judgments, and an intention to prevent Mr. Callahan from collecting on his judgments.

### 3.   The Debtor's Financial Affairs and Dealings with Ella Coney.

Ms. Coney is a mother of three children, including the Debtor.  (Ex. 44 at 13:9-11; 30:12-21.)  She is also a grandmother.  (Ex. 44 at 13:22-24.)  Ms. Coney has two bachelor's degrees:  one in computer science and another in real estate finance.  (Ex. 44 at 13:21-15:13.)  She also started a master's degree and completed coursework to obtain a real estate license.  (Ex. 44 at 15:4-16:5; 17:15-17.)  She earned her living by running her own property management and property renovation business and, for the ten years prior to the Adversary Proceeding, she was engaged in real estate and property management.  (Ex. 44 at 13:12-15, 16:6-13.)  In those capacities, Ms. Coney has written up contracts for the purchase and sale of real estate and bought and sold

14

properties.  (Ex. 44 at 17:19-18:2.)  She also was a member of a limited liability company called Coney Management and Realty.  Ms. Coney dissolved that company in 2018, though she continued to use it as a d/b/a.  (Ex. 44 at 19:8-20:10; at 113:2-115:17.)

During the Debtor's custody proceedings, the Debtor struggled financially.  Ms. Coney knew that he was having difficulty, so, when he asked for help, she would loan him $500 here or there.  If he had a large attorney fee bill, she would sometimes loan him $2,000 or $5,000.  Ms. Coney did not volunteer to loan the money, but provided it when the Debtor asked.  The amounts she loaned varied over the year.  Ms. Coney also gave the Debtor some funds.

The transactions between Ms. Coney and the Debtor were mostly done by means of cashiers' checks, though she also gave him some funds in cash.  No contemporaneous written agreements were made when Ms. Coney gave the Debtor money – the Debtor simply made a verbal promise to pay his mother back.

In December 2021, after the Debtor lost his appeal to the Colorado Court of Appeals, the Debtor asked Ms. Coney for $10,000 so he could make what he thought would be a fair settlement payment to Mr. Callahan in the amount of $11,000.  (Mr. Callahan never agreed to that proposed settlement, and the Debtor rejected Mr. Callahan's $17,000 counteroffer.)  The Debtor testified that, at that point, Ms. Coney put the receipts for the cashier's checks she had already given him in his face and said she would require collateral before providing any other loans.  She wanted to put a lien on his house, and he felt he had to agree to her terms.  The Court describes the receipts that Ms. Coney showed Mr. Gibson, which were admitted into evidence, as follows:

- A check dated June 15, 2021, in the amount of $4,350.00 (Ex. C);

- A check dated June 15, 2021, in the amount of $2,200.00 (Ex. D);

- A check dated June 15, 2021, in the amount of $3,450.00 (Ex. E);

- A check dated July 8, 2021, in the amount of $5,000.00 (Ex. F);

- A check dated August 16, 2021, in the amount of $5,000.00 (Ex. G);

- A check dated August 18, 2021, in the amount of $4,010.00 (Ex. H);

- A check dated August 19, 2021, in the amount of $4,886.00 (Ex. I).

On January 27, 2022, per the Debtor's request (and notwithstanding that the Debtor claims to know "very little about her son's financial affairs",[4] Ms. Coney provided the Debtor with another $10,000 cashier's check. (Ex. L)  The same day, January 27, 2022, the Debtor and Ms. Coney signed both a "Colorado Promissory Note (Secured)" (Ex. 22, the "Promissory Note") and a "Deed of Trust" (Ex. 23 and Ex. 10 to Complaint). In the Promissory Note, "Michael Coney" promised to pay "Ella M. Coney" the principal

---

[4]     Docket No. 96 at 18 (citing deposition testimony).

sum of $45,000.00, with interest accruing on the unpaid balance at a rate of 5% per annum. (Ex. 22.)  The Debtor also agreed to make monthly payments in the amount of $269.98 to Ms. Coney, which payments were to consist of both principal plus interest. In the Deed of Trust, the Debtor granted a security interest in the Property to "Ella M. Coney" as security for the amounts due on the Promissory Note.  (Ex. 23 and Ex. 10 to Complaint.)  The Deed of Trust was recorded in the real property records by the Clerk and Recorder for Adams County, Colorado, on January 27, 2022, at reception no. 2022000008445.  (Ex. 23 and Ex. 10 to Complaint.)

The Debtor testified at trial that, prior to January 27, 2022, he made periodic payments to Ms. Coney in the amount of $238, and that he started making such payments in March 2021.  He said had repaid $25,000 of the amount owed to Ms. Coney by the time they signed the Promissory Note and Deed of Trust.  But he signed the documents to "make it official."

All together, the cashiers' check receipts from 2021 evidence transfers in the total amount of $28,896.00 from Ms. Coney to the Debtor, and the cashier's check receipt from January 27, 2022, evidences another $10,000 transfer from Ms. Coney to the Debtor.  When asked why, if the Debtor had already repaid $25,000 to Ms. Coney, he agreed in the Promissory Note to repay her $45,000 plus interest, the Debtor testified that, in addition to the transfers evidenced by the cashiers' checks, Ms. Coney had given him cash "here and there" and he knew he owed her at least $45,000, though he could not say or show how much cash Ms. Coney had given him nor provide documentation showing that the cash transfers were loans.  The Court finds that the Debtor's testimony that Ms. Coney provided consideration to him above the $28,896.00 evidenced by the cashiers' checks (Exs. C-I) cannot be credited, as Ms. Coney failed at trial to provide evidence containing specific details about any alleged cash transfers, such as testimony regarding the dates or amounts of any such cash transfers, let alone any corroborating documentary evidence, such as copies of bank account records.  The Court also found the Debtor not to be credible.  Accordingly, the Court finds that, as of January 27, 2022, prior to the time Ms. Coney loaned him the additional $10,000.00, the Debtor owed Ms. Coney $3,896.00.

None of the cashiers' checks or cash received from Ms. Coney in any of the foregoing transactions were deposited into the Debtor's bank accounts.  Instead, the Debtor used the cash, or the cash received from cashing the cashier's checks, to purchase money orders, which he then used to pay his mortgage and other bills.  (*See* Ex. P.)  In fact, though the Debtor had bank accounts, he did not really use them.  He testified that he that he could not use his Navy Credit Union account because Mr. Gillette had used an order from the State Court Litigation and sent something to Navy Federal Credit Union that had resulted in his being locked out of his main bank account, the one into which his paychecks were deposited.  It was, in part, because of this, the Debtor said, that he started borrowing money from Ms. Coney.

According to Ms. Coney, the Debtor's use of the cash and money-order system to pay his bills, and his non-use of banks, was a technique taught by Dave Ramsey in his "Total Money Makeover" class.  (Ex. 44 at 91-92.)  Ms. Coney, who used the technique herself (*see* Ex. 44 at 49:3-20), described it this way at her deposition:

> It's an extensive course, but it talks about an envelope
> system full of cash.  And so we have one for food and one
> for utilities, and when the cash is gone, you just don't have
> anything else to pay.  You can't borrow money from one
> cash to the other.  But when you deal with cash, you don't
> spend as much.  So I do know that that's one of the
> techniques that Dave Ramsey taught.  When you're building
> your financial future, you start out with envelopes with just
> enough cash to pay that bill.  And then when your money is
> gone, you've got to stop spending.

(Ex. 44 at 91:19-92:6.)

It was not just from Ms. Coney that the Debtor borrowed money.  On November 29, 2022, the Debtor took a $5,000.00 cash advance from Rocky Mountain Law Enforcement Credit Union ("Rocky Mountain").  (Ex. 33; Ex. 36 at 11:10-12.)  The funds from the cash advance were withdrawn in cash.  (*Id.*)

When asked what happened to the money, the Debtor gave the following testimony:

> [Debtor]: I have that money set aside.
>
> [Creditor's Counsel]: Okay. So you had it in cash on the date
> the bankruptcy case was filed?
>
> [Debtor]: I think I did it after the bankruptcy was filed.
>
> [Creditor's Counsel]: November 29th is three days before you
> filed your bankruptcy case, right?
>
> [Debtor]: Okay.
>
> [Creditor's Counsel]: So you had it in cash?
>
> [Debtor]: I took that in cash, and that was -- that is being held
> by one of my creditors.
>
> [Creditor's Counsel]: So you took that $5,000.00 and gave it
> to Ella Coney?
>
> [Debtor]: Yes.

(Ex. 36 at 11:10-12:2.)  On December 1, 2022, the Debtor took another $5,000.00 cash advance from Rocky Mountain.  (Ex. 34; Ex. 36 at 12:9-21.)  And on December 7, 2022 (after he filed for bankruptcy protection), the Debtor took a third cash advance of $5,000.00 from Rocky Mountain.  (Ex. 34.)  The proceeds of the December 1 and December 7 cash advances were also taken in cash.  With respect to proceeds from the December 1 cash advance, the Debtor, under oath, testified at the Section 341 meeting:

17

"that money is being held by Ella Coney."  (Ex. 36 at 12:22-24.)  The following colloquy followed:

> [Creditor's Counsel]:  What do you mean when you say that it's being held by Ella Coney?
>
> [Debtor]:  Well, she has a lien on the house.  So in order to enter into a reaffirmation agreement and make that kind of whole, the reaffirmation we were going to enter into, she has -- she's holding that money.
>
> [Creditor's Counsel]:  When you say she's holding that, do you mean she's holding that for your future use, or did you pay that money toward the amount you owe her?
>
> [Debtor]:  I paid it toward the amount I owe her.
>
> [Creditor's Counsel]:  Okay. So when you say that she's holding it, you mean you paid that money to a creditor right before you filed the bankruptcy case?
>
> [Debtor]:  I wouldn't put it that way, because the whole reason that I got it in the first place was to front the living expenses.  So I enter a reaffirmation agreement that I might be able to get it back for my living expenses.
>
> [Creditor's Counsel]:  Okay. So either you took $10,000.00, you have a creditor who is holding that money for your benefit, or you paid that money to a creditor toward the debt, but you're not sure which. Do I have that right?
>
> [Debtor]:  Yeah, I'm not really sure how it's going to go.
>
> [Creditor's Counsel]:  Okay. But the one thing we're sure about is that $10,000.00 doesn't show up anywhere on your bankruptcy Schedules, right?
>
> [Debtor]:  It does not. It was a cash advance.
>
> [Creditor's Counsel]:  Okay. So you didn't list those payments to Ella Coney, correct?
>
> [Debtor]: No.

(Ex. 36 at Ex. 36 at 12:25-14:6.)

At trial, the Debtor's story shifted.  He testified that, immediately after he took out the December 1, 2022 transfer, he used the money to purchase money orders, which he sent to other creditors the same day as payment for amounts he owed to them.  As such, the Debtor asserted, he did not have the $5,000.00 from the December 1, 2022

cash advance in his possession on the Petition Date.  The Debtor did not produce any receipts for money orders or other documentation that supported his contention.  The Court found such testimony not credible.

Ms. Coney recalled receiving some money from her son.  In her deposition, Ms. Coney acknowledged that the Debtor had paid her $5,000.00 on November 29, 2022, (Ex. 44 at 133:9-11; 136:25-137:5; 142:19-22.)  Though Ms. Coney has no written record of receiving $5,000.00 on that date, she testified: "I know he gave it to me."  (Ex. 44 at 136:25-137:20 and 142:19-22.)  She produced a written "Receipt for Cash Payment" dated November 29, 2022, and stated she had received $2,429.82 from the Debtor on that date.  In her deposition, Ms. Coney agreed that, in the Receipt for Cash Payment, the Debtor represented that the $2,429.82 "represented three months' worth of payments to [Ms. Coney], and then a $1,619.88 payment applied toward the principal balance." (Ex. 44 at 143:14-144:11.)  Ms. Coney did not have a ledger showing receipt of the $2,429.82 payment.  (Ex. 44 at 144:12-21.)  According to Ms. Coney, the Debtor was in default of the loan she had made to him, and the "money was to catch those back payments up."  She agreed when asked that the payments "were not made in the normal course and what's required under the loan document." (Ex. 44 at 145:13-146:4.)  In her deposition, Ms. Coney initially could not recall receiving a second payment of $5,000.00 from her son in December 2022; however, upon reviewing documents at her deposition (Ex. 44 at 154:17-156:16), Ms. Coney acknowledged receiving $5,000.00 from the Debtor on December 7, 2022.  (Ex. 44 at 162:2-4.)

With respect to the disposition of the $5,000.00 from the November 29, 2022 cash advance, the Court credits the Debtor's Section 341 meeting testimony that he gave the $5,000 to Ms. Coney.  The Court understands from the testimony that, at the time the Debtor transferred the funds to Ms. Coney, he did so with the intention that she apply it both toward amounts that had already come due and toward his future payments as they came due.  The Court also credits Ms. Coney's deposition testimony that she received $5,000.00 from the Debtor on November 29, 2022, and discounts her later testimony that she received anything less than that amount.  The Court does so because Ms. Coney's testimony early in the deposition seemed more certain than her later testimony, and because it corroborates the Debtor's original testimony at the Section 341 meeting of creditors.[5]

The Court also credits the Debtor's testimony at the Debtor's March 21, 2023 Section 341 meeting of creditors that he gave the $5,000 from December 1, 2022 cash advance to his mother to hold rather than the Debtor's trial testimony that he used those funds to procure money orders that he used to pay other creditors.  Thus, the Court finds that the Debtor transferred the $5,000.00 from the December 1, 2022 cash advance to Ms. Coney.  The Court credits the Section 341 testimony because it was given in March 21, 2023 – less than four months after the Debtor took the cash advance, when the event was fresh in the Debtor's mind, while his trial testimony was provided on May 13, 2025 – more than 29 months after the cash advance, and after he had had time to understand the implications of acknowledging in this litigation that the

---

[5]     The so-called "Receipt for Cash Payment" dated November 29, 2022, was not offered or admitted into evidence at trial.  Given the shift in testimony over time, and the Debtor's and Ms. Coney's motives, the Court questions the validity of such receipt.

transfer was made to Ms. Coney.  In addition, the Court firmly believes that the change in the Debtor's story at trial was motivated both by a desire to prevent any money from reaching his creditors (Mr. Callahan in particular) and a desire to keep the funds in the hands of his mother.  The Court, therefore, finds that the Debtor gave the proceeds of the $5,000.00 pre-petition cash advance to Ms. Coney.  The Court further finds, based on Ms. Coney's deposition testimony, that the transfer of the $5,000.00 from the December 1, 2022 cash advance was made on December 7, 2025.[6]

### 4.    The Debtor's Bankruptcy Case.

The Debtor, appearing *pro se*, filed for protection under Chapter 7 of the Bankruptcy Code  on December 2, 2022.  (Ex. 63.)  Initially, he did not submit a Schedule A/B listing his assets, nor a statement of financial affairs.  (*See* Main Case Docket.)  On his Schedule D, the Debtor listed only one creditor holding a secured claim:  "Ella Coney," with a claim in the amount of $45,000 for a debt incurred on January 27, 2022.  The Debtor stated in Schedule D that Ella Coney's claim was secured by his primary residence.  On his Schedule E/F, the Debtor identified only four unsecured claims: a claim in the amount of $21,866.60 owed to Hampton & Pigot LLP; a claim in the amount of $5,166.50 owed to Reynolds and Gillette LLC; a claim of $17,1901.88 owed to Kendrick Legal Solutions.  (*Id*. at 15.)  The Debtor identified all of the foregoing claims, except the one owed to Hampton & Pigot LLP, as "Obligations arising out of a separation agreement or divorce that you did not report as priority claims."  The Debtor did not assert that the any of the unsecured claims was "disputed" or "contingent"; however, he did claim that they were "unliquidated."  (*Id.*)  On his Schedule I, the Debtor asserted that he earned just $375 per month (derived from family support).  (*Id*. at 19.)  On Schedule J, the Debtor listed expenses for a first mortgage in the amount of $2,300 per month.  (*Id*. at 20.)  He did not include a line item for payment of Ms. Coney's loan.  In the Debtor's "Declaration About an Individual's Schedules" (*Id*. at 23), the Debtor stated:  "Under penalty of perjury, I declare that I have read the summary and schedules filed with this declaration and that they are true and correct."

On December 12, 2022, the Debtor filed a "Statement of Financial Affairs" (Ex. 64.)  Therein, the Debtor listed his sources of income as follows:

---

[6]    Ms. Coney argues that the funds she received on December 7, 2022, were proceeds of the December 7, 2022 cash advance.  But, Ms. Coney failed to offer any evidence on this point.  And, the Court finds the Debtor's testimony that he purchased money orders to pay other creditors with the proceeds of the December 1, 2022 cash advance not to be credible in light of his testimony at the Section 341 meeting that he gave the funds to Ms. Coney.  Under the circumstances, and particularly in light of the absence of documentary evidence showing otherwise, the Court infers that the Debtor's transfer of $5,000.00 to Ms. Coney on December 7, 2022, was a transfer of proceeds from the December 1, 2022 cash advance.

4. **Did you have any income from employment or from operating a business during this year or the two previous calendar years?**
   Fill in the total amount of income you received from all jobs and all businesses, including part-time activities.
   If you are filing a joint case and you have income that you receive together, list it only once under Debtor 1.

☐ No
☑ Yes. Fill in the details.

| | Debtor 1 | | Debtor 2 | |
|---|---|---|---|---|
| | Sources of income<br>Check all that apply. | Gross income<br>(before deductions and exclusions) | Sources of income<br>Check all that apply. | Gross income<br>(before deductions and exclusions) |
| **From January 1 of current year until the date you filed for bankruptcy:** | ☑ Wages, commissions, bonuses, tips<br>☐ Operating a business | $ 0.00 | ☐ Wages, commissions, bonuses, tips<br>☐ Operating a business | $ |
| **For last calendar year:**<br>(January 1 to December 31, 2021 )<br>YYYY | ☑ Wages, commissions, bonuses, tips<br>☐ Operating a business | $ 15,879.00 | ☐ Wages, commissions, bonuses, tips<br>☐ Operating a business | $ |
| **For the calendar year before that:**<br>(January 1 to December 31, 2020 )<br>YYYY | ☑ Wages, commissions, bonuses, tips<br>☐ Operating a business | $ 27,532.00 | ☐ Wages, commissions, bonuses, tips<br>☐ Operating a business | $ |

5. **Did you receive any other income during this year or the two previous calendar years?**
   Include income regardless of whether that income is taxable. Examples of *other income* are alimony; child support; Social Security, unemployment, and other public benefit payments; pensions; rental income; interest; dividends; money collected from lawsuits; royalties; and gambling and lottery winnings. If you are filing a joint case and you have income that you received together, list it only once under Debtor 1.

   List each source and the gross income from each source separately. Do not include income that you listed in line 4.

☐ No
☑ Yes. Fill in the details.

| | Debtor 1 | | Debtor 2 | |
|---|---|---|---|---|
| | Sources of income<br>Describe below. | Gross income from each source<br>(before deductions and exclusions) | Sources of income<br>Describe below. | Gross income from each source<br>(before deductions and exclusions) |
| **From January 1 of current year until the date you filed for bankruptcy:** | Child Support<br>_____<br>_____ | $ 1,750.00<br>$<br>$ | _____<br>_____<br>_____ | $<br>$<br>$ |
| **For last calendar year:**<br>(January 1 to December 31, 2021 )<br>YYYY | Rent Collected<br>_____<br>_____ | $ 20,400.00<br>$<br>$ | _____<br>_____<br>_____ | $<br>$<br>$ |
| **For the calendar year before that:**<br>(January 1 to December 31, 2020 )<br>YYYY | Rent Collected<br>_____<br>_____ | $ 11,900.00<br>$<br>$ | _____<br>_____<br>_____ | $<br>$<br>$ |

(Ex. 64 at 2.)[7]  When asked:  "Within one year before you filed for bankruptcy, did you make a payment on a debt you owed to anyone who was an insider?," the Debtor responded that he had paid $2,429.82 to Ella Coney on February 5, March 5, and April 5, 2022.  He further stated that the amount he still owed to Ms. Coney was $42,300. (*Id.* at 4.)  When asked:  "Within 1 year before you filed for bankruptcy, did you make any payments or transfer any property on account of a debt that benefited an insider?," the Debtor checked the "No" box.  (*Id.* at 4.)  When asked:  "Within 2 years before you filed for bankruptcy did you sell, trade, or otherwise transfer any property to anyone,

---

[7]     The Debtor admitted at trial to failing to disclose his receipt of the $20,400 in rent received in 2021 from his 2021 tax returns.

other than property transferred in the ordinary course of business?", the Debtor checked the "No" box.  (Ex. 64 at 8.)

The same day, the Debtor filed Schedule A/B in which he listed the Property, stating that it had a value of $615,000; two BMW automobiles with a value of $3,000 and $1,000; household and personal items with a total value of $6,500; $1,000 in cash; a checking account at Navy Federal Credit Union with $175; a Navy Federal Credit Union certificate of deposit with a value of $300; and a Thrift Savings Account with a value of $75,000.  (Ex. 65.)  He also filed a Schedule C claiming exemptions pursuant to COLO. REV. STAT. § 13-54-102 in virtually all of the aforementioned assets, including a $210,000 exemption in the Property,[8] a $4,000 in his vehicles; a $5,500 exemption in his household items, and a $76,475 exemption in his financial assets. (*Id.*) The Debtor also filed Schedules G and H.  (*Id.*)  In a new "Declaration About an Individual's Schedules" (Ex. 65), the Debtor stated:  "Under penalty of perjury, I declare that I have read the summary and schedules filed with this declaration and that they are true and correct."

On April 11, 2023, the Debtor amended some of his Schedules (Ex. 66, the "Amended Schedules") and filed a new a "Summary of Your Assets and Liabilities and Certain Statistical Information" in which he indicated that he had $270,102.15 in assets and $504,179.75 in liabilities.  In his Amended Schedule A/B, the Debtor listed a lower value for the Property:  $580,000.  He also added a savings account at Rocky Mountain with a value of $127.15.  Besides the items listed in his original Schedule A/B, the Debtor listed no other additional property on his Amended Schedule A/B.  On Amended Schedule D, the Debtor listed a new creditor with a claim secured by the Property: Freedom Mortgage, with a claim in the amount of $397,464.  The Debtor also changed the name of the other creditor identified on Schedule D as having a claim secured by the Property from "Ella Coney" to "Coney Management, Inc."  And on Amended Schedule E/F, the Debtor listed another new creditor:  USAA Savings Bank, with a claim in the amount of $15,606.

The Debtor did not list on Schedule A/B the proceeds of the two $5,000.00 cash advances received from Rocky Mountain which he claimed were being held for him by Ms. Coney.  The Debtor did not list in Schedule E/F any amounts due to Rocky Mountain as a result of his taking the pre-petition cash advances.[9]  The Debtor did not

---

[8]    The Court does not understand the basis for this claim of exemption.  COLO. REV. STAT.§ 13-54-102 does not provide for a homestead exemption – that exemption, instead, appears in COLO. REV. STAT. § 38-41-201(1)(b).

The Debtor filed for Chapter 7 protection on December 2, 2020.  At the time he filed for bankruptcy relief, COLO. REV. STAT. § 38-41-201(1)(b) provided for a general homestead exemption in the amount of $105,000.  A few months later, effective April 7, 2022, Colorado changed (increased) its homestead exemption to $250,000.  However, Colorado bankruptcy debtors are not entitled to the higher homestead exemption in cases which were filed prior to the new homestead law.  *See In re Gomez*, 646 B.R. 523 (Bankr. D. Colo. 2022) ("The law — including the Bankruptcy Code, the Colorado Constitution, Colorado statutes, and directly apposite case law — dictates that SB 22-086 cannot be applied retroactively.").  So, at most, the Debtor is entitled to an exemption of $105,000.00 under COLO. REV. STAT.§ 38-41-201(1)(b).  However, no party has yet objected to the Debtor's claimed exemption.

[9]    The Debtor acknowledged taking the cash advances on November 29 and December 1, 2022, but testified that he "very intentionally" omitted Rocky Mountain from his schedules because he was going to pay them back.  In fact, the Debtor testified, his payments to Rocky were "almost done."

identify Mr. Callahan as a creditor by name (though he did list the law firm representing Mr. Callahan in the State Court Litigation).  The Debtor did not list regular payments due to Ella Coney pursuant to the Promissory Note on Schedule J.  The Debtor did not list in his Statement of Financial Affairs a transfer of $5,000.00 on November 29, 2022.  The Debtor also did not list a transfer of $2,429.82 on November 29, 2022.  The Debtor did not disclose that he had $5,000.00 from the December 1, 2022 cash advance in his possession on the Petition Date, did not disclose that he had transferred the $5,000.00 to any creditors, and did not disclose that he had transferred the $5,000.00 to Ella Coney.  Still, with respect to his statement and schedules, as amended, the Debtor stated:  "Under penalty of perjury, I declare that I have read the summary and schedules filed with this declaration and that they are true and correct."  (*Id.* at 18.)

The Trustee had concerns about what he learned from reviewing the Debtor's schedules and from the Section 341 meeting, as well as information he gained from an attorney representing Mr. Callahan.  At the 341 meeting, Mr. Sender got what he described as "strange answers" from the Debtor in response to the questions he posed about the $45,000.00 lien against the Debtor's property in favor of Ms. Coney, and was left without clear information about the consideration provided in exchange for the lien.  He wondered whether the consideration was made up.  Mr. Sender also had concerns about cash transfers made by the Debtor to Ms. Coney before and after the Debtor's bankruptcy, and questions about whether Ms. Coney was holding property of the bankruptcy estate.  All of this led the Trustee to employ counsel to conduct an investigation into the matter.

The Court understands why the Trustee pursued an investigation.  The Debtor's omission of information from his schedules and statements, his lack of documentation showing his financial activities, and his history of evasion and obstruction, as recognized by the State Court and as described by Mr. Gillette (whom the Court viewed as forthright and credible), cause the Court to question Debtor's honesty both at the 341 meeting and in this tribunal.  Whatever the value Dave Ramsey's cash transaction money management technique may be in helping consumers rein in their spending, the end result of the Debtor's and Ms. Coney's use of the Ramsey technique is that the evidence about how both Ms. Coney and the Debtor used and managed their money is scant and confusing.  Because of the lack of documentation, the Court is left without a clear picture of how much money the Debtor owed Ms. Coney on the Petition Date, and of what, exactly, happened to the proceeds of the cash advances.  As a result, the Court was left to make factual determinations based in part on the absence of evidence.

The Court firmly believes that the Debtor operated on a cash basis not just as a money management technique, but also to avoid efforts to collect money pre-petition and to avoid accounting for and tracing of estate property post-petition.  The Court further finds the Debtor omitted mention of the debts owed to Rocky Mountain as a result of his taking the November 29 and December 1, 2022 cash advances from his statements and schedules because he did not want for his creditors or his case trustee to know of the existence of the cash advances or to be alerted that he had placed the proceeds from the cash advances in his mother's possession.  Thus, the Court assesses that the Debtor falsified his schedules.

## V.    Conclusions of Law.

### A.    Trustee's Standing under the CUFTA.

As an initial matter, Ms. Coney disputes that the Trustee stands in the shoes of a hypothetical lien creditor such that he has authority to avoid the Home Loan Transaction under Section 105(1) of the CUFTA.  Specifically, Ms. Coney asserts that the Trustee does not stand in the shoes of a hypothetical lien creditor because "Mr. Callahan's claim was dismissed."  Such contention is without merit.

Pre-petition, Mr. Callahan obtained a judicial lien against the Property.  Though the Court dismissed Mr. Callahan's complaint to establish nondischargeability of the debt underlying the lien pursuant to Section 523(a) in a different adversary proceeding in this Court,[10] such dismissal does not mean that Mr. Callahan holds no claim nor that his lien is extinguished.  As the Trustee notes, a discharge under Section 524 operates as an injunction against the collection of a discharged debt "as a *personal liability* of the debtor."  11 U.S.C. § 524(a)(2) (emphasis added).  But, "[c]reditors with valid claims against the bankruptcy estate on the date the bankruptcy petition is filed do not lose them simply because the debtor is granted a discharge. . . .'" *In re Carrow*, 315 B.R. 8, 21 (Bankr. N.D.N.Y. 2004).  Indeed, [j]udicial liens are not discharged in bankruptcy. *Pettine v. Direct Biologics. LLC (In re Pettine)*, 655 B.R. 196, 219 n.82 (10th Cir. BAP 2023) (citing Section 524(a)(1)).  Because Mr. Callahan had a valid judicial lien on the Petition Date, and because such lien has not been discharged, the Trustee stands in Mr. Callahan's shoes and thus has standing to assert claims under Section 544, including claims under the CUFTA.

### B.    Claims to Avoid the Home Loan Transaction.

In the Complaint, at trial, and in his closing briefs, the Trustee asserted that the pre-petition transfer of estate property effected by the Debtor's signing of the Promissory Note and Deed of Trust in favor of Ms. Coney on January 27, 2022 (the "Home Loan Transaction"), was avoidable as a matter of law.  He asserted claims to avoid the transfer under various alternative theories, including under:  Section 547 (in the second claim for relief); Section 548(a)(1)(A) (in the third claim for relief); Section 548(a)(1)(B) (in the fourth claim for relief); the Colorado Uniform Fraudulent Transfer Act, COLO. REV. STAT. § 38-8-105(1)(a), with the Trustee creditor standing in the shoes of a hypothetical lien creditor under Section 544(b) (in the fifth claim for relief); and COLO. REV. STAT. § 38-8-105(1)(b), with the Trustee standing in the shoes of a hypothetical lien creditor under Section 544(b) (in the sixth claim for relief).

#### 1.    Claim to Avoid the Home Loan Transaction as an Actual Fraudulent Transfer.

Section § 548(a) provides, in relevant part:

---

[10]     *See*, *generally*, *Callahan v. Gibson (In re Gibson)*, Adv. Pro. No. 23-1098 (Bankr. D. Colo.)

> (1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily . . .
>
> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted . . . .

11 U.S.C. § 548(a)(1)(A). Meanwhile, Section 105(a) of the Colorado Uniform Transfer Act ("CUFTA") states:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (a) With actual intent to hinder, delay, or defraud any creditor of the debtor . . . .

COLO. REV. STAT. § 38-8-105(1)(a) (emphasis added).

A cause of action for "actual intent to hinder, delay, or defraud" is commonly referred to as a claim for "actual fraud." *Coder v. Arts*, 213 U.S. 223 (1909) ("This form of expression is familiar to the law of fraudulent conveyances, and was used at the common law, and in the statute of Elizabeth, and has always been held to require, in order to invalidate a conveyance, that there shall be actual fraud . . . ."); *Picard v. Ida Fishman Revocable Tr. (In re Bernard L. Madoff Inv. Secs., LLC)*, 773 F.3d 411, 416 (2d Cir. 2014) (transfer made with "actual intent to hinder, delay, or defraud" is "often referred to as 'actual fraud'").

To prevail on his claim for actual fraudulent transfer under either Section 548(a)(1)(A) or COLO. REV. STAT. § 38-8-105(1)(a) (with the Trustee creditor standing in the shoes of a hypothetical lien creditor under Section 544(b)), the Trustee must show (i) a transfer of an interest of the Debtor in property; (ii) made within two years before the Debtor filed for bankruptcy; and (iii) done with "actual intent to hinder, delay, or defraud" a creditor. *See Manchester v. Sharpton (In re All Phase Roofing & Constr., LLC)*, 2020 WL 374357, at *9 (Bankr. W.D. Okla. Jan. 17, 2020) (identifying the elements a trustee must prove to sustain a claim under Section 548 and citing *Wagner v. McAnena (In re Vaughan Co.)*, 2014 WL 3889193, *2 (Bankr. D. N.M. 2014) and *McHale v. Boulder Cap. LLC (In re 1031 Tax Group, LLC)*, 439 B.R. 47, 68 (Bankr. S.D.N.Y. 2010)).

As the plaintiff, the Trustee bears the burden to prove the Home Loan Transaction was fraudulent under both Section 548(A)(1)(A) and the CUFTA.  *Gould v. Liebl-Weaver (In re Darter)*, 2024 WL 5152577, at *13 (Dec. 16, 2024 (citing *Weinman v. Walker (In re Adam Aircraft Indus., Inc.)*, 510 B.R. 342, 352 (10th Cir. BAP 2014), *aff'd*, 805 F.3d 888 (10th Cir. 2015)); *Schempp v. Lucre Mgmt. Group, LLC*, 75 P.3d 1157, 1165 (Colo. App. 2003) [hereinafter *Schempp II*]; *Fifth Third Bank v. Morales*, 2017 WL 6492108, at *2 (D. Colo. Dec. 19, 2017).  But, "actual intent" can be quite difficult to prove.  *See Fifth Third Bank*, 2017 WL 6492108, at *2 ("'actual intent' under [CUFTA] is seldom susceptible to direct proof.");  *Darter*, 2024 WL 5152577, at *14 (noting that "[a] debtor rarely admits he or she acted with fraudulent intent" and citing *Zubrod v. Kelsey (In re Kelsey)*, 270 B.R. 776, 782 (10th Cir. BAP 2001)).  Therefore, a court may consider circumstantial evidence establishing badges of fraud.  *Id.* (citing *Taylor v. Rupp (In re Taylor)*, 133 F.3d 1336, 1338-39 (10th Cir. 1998)).  In evaluating whether a debtor has acted with fraudulent intent, courts consider certain "badges of fraud."  Relevant factors under Section 548 include:

> [1] whether the transfer was to an insider; [2] whether the debtor retained possession or control of the property after the transfer; [3] concealment of the transfer; [4] pending or threatened litigation against the debtor at the time of transfer; [5] a transfer of substantially all of the debtor's assets; [6] absconding by the debtor; [7] removal or concealment of assets; [8] reasonably equivalent value in exchange for the transfer; [9] the debtor's insolvency at the time of the transfer; [10] the proximity in time of the transfer to the incurrence of a substantial debt; and [11] a transfer of substantial business assets to a lienor followed by a subsequent transfer of such assets to an insider of the debtor.

*Kelsey*, 270 B.R. at 782 (citing *Taylor*, 133 F.3d at 1338-39); *Darter*, 2024 WL 5152577, at *14 (quoting *Kelsey*).  The factors are virtually the same under COLO. REV. STAT. § 38-8-105(2).  *See Fifth Third Bank*, 2017 WL 6492108, at *2-3 (listing factors in Section 105(1)(a) of the CUFTA).

### a.    The Execution of the Promissory Note and Deed of Trust was a Transfer of the Debtor in Property.

"Transfer" is defined in Section 101(54) as follows:

(54) The term "transfer" means –
    (A) the creation of a lien;
    (B) the retention of title as a security interest;
    (C) the foreclosure of a debtor's equity of redemption; or
    (D) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with –
        (i) property; or
        (ii) an interest in property.

26

By signing the Promissory Note and Deed of Trust, which was then recorded, the Debtor created a lien in favor of Ms. Coney. Thus, the Home Loan Transaction constitutes a transfer under § 101(54). *See also In re Elkind*, 11 B.R. 473, 475 (Bankr. D. Colo. 1981) (recording of deed of trust was a transfer).

### b.   Whether the Debtor Retained Possession or Control of the Property After The Transfer.

The Debtor did not retain control of the interest transferred to Ms. Coney.

### c.   The Home Loan Transaction was Done with "Actual Intent to Hinder, Delay, or Defraud" the Debtor's Creditors.

In this case, a number of badges of fraud exist with respect to the Home Loan Transaction. The Court will discuss each of the relevant factors[11] below.

### (i.)   The Home Loan Transaction Was a Transfer to an Insider.

Section 101(31)(A)(i) defines "insider" to include (among other things) "a relative of the debtor" where the debtor is an individual. Similarly, the CUFTA defines "insider" to mean "a relative of the debtor" where the debtor is an individual. COLO. REV. STAT § 38-8-102(8)(a)(I). Meanwhile, Section 101(45) defines "relative" to mean an "individual related by affinity or consanguinity within the third degree as determined by the common law, or individual in a step or adoptive relationship within such third degree," and the CUFTA defines individual to mean "an individual related by consanguinity within the third degree as determined by the common law, a spouse, or an individual related to a spouse within the third degree as so determined, and includes an individual in an adoptive relationship within the third degree." COLO. REV. STAT § 38-8-102(12).

Ms. Coney is the Debtor's mother, an individual related to the Debtor by consanguinity within the third degree, and thus an insider under both the Bankruptcy Code and the CUFTA. The Debtor owns the Property, and transferred an interest in the Property by means of the Home Loan Transaction to Ms. Coney. Thus, the Home Loan Transaction was a transfer to an insider. This factor suggests fraudulent intent.

### (ii.)   The Transfer was Made Within Two Years Prior to the Debtor's Bankruptcy Filing.

The Home Loan Transaction was made on January 27, 2022 – just over ten months prior to the Petition Date. Thus, the transfer effected by the Home Loan Transaction was made within the two-year preference period provided for in Section 548(a)(1)(A) and COLO. REV. STAT. § 38-8-105(1)(a). This factor is suggestive of fraudulent intent.

---

[11] The "absconding by the debtor"; "removal or concealment of assets; and "transfer of substantial business assets to a lienor followed by a subsequent transfer of such assets to an insider of the debtor" factors are not applicable and do not weigh one way or the other in evaluating the Debtor's intent.

### (iii.) Concealment and Dishonesty in Disclosures Related to the Home Loan Transaction.

Though the Debtor listed a secured debt arising from the Home Loan Transaction on his schedules and accurately identified the date the Home Loan Transaction occurred, and though the Home Loan Transaction was documented in the property records for the Clerk and Recorder for Adams County, the Debtor was not completely honest in his schedules and statements about the transfer itself or the circumstances surrounding it.  He stated on Amended Schedule D he owed a $45,000.00 to "Coney Management" when, in fact, the Promissory Note identifies "Ella M. Coney" as the lender to whom the Debtor is obligated.  And, the Debtor did not list any payments made to Ms. Coney on account of the Home Loan Transaction when asked to list payments on account of a debt owed to an insider in his Statement of Financial Affairs (Ex. 64 at 4, question 7), nor did he list any payments due to Ms. Coney under the Promissory Note on his Schedule J.  (Ex. 63 at 20.)  This factor is suggestive of fraudulent intent.

### (iv.) Pending or Threatened Litigation Against the Debtor at the Time of Transfer and the Proximity in Time of the Transfer to the Incurrence of a Substantial Debt.

At the time the Debtor entered into the Home Loan Transaction, he was deep in the thralls of litigation in the State Court Litigation.  Judgment was not just threatened, but had entered on January 4, 2022 – just days before the Home Loan Transaction – in favor of Mr. Callahan and against the Debtor.[12]  These two factors weigh in favor of a finding of fraudulent intent.

### (v.) Transfer of Substantially All of the Debtor's Assets.

The Debtor reported having very few assets.  His largest assets are the Property, which he values at $580,000 on Amended Schedule A/B, and his Thrift Savings Plan account, which he values at $75,000.  (Ex. 65.)  The Debtor stated in Schedule D that the secured claim for the first mortgage held by Freedom Mortgage was for $397,464, leaving $182,536 in equity in the Property.  The transfer to Ms. Coney was of about 41% of the non-exempt equity in the Property – a healthy portion, but such transfer was

---

[12]    Ms. Coney seems to suggest that this factor was not met.  She argues that, because the Debtor had appealed the judgment, his evasion of Mr. Callahan's supposedly excessive discovery requests was not fraudulent.  But the State Court took a different view, as does the Court.  Since there was no stay of the judgment pending appeal, Mr. Callahan had every right to pursue collection of the judgment.  His discovery requests were perfectly in line with such efforts.  Ms. Coney also suggests that the Trustee is acting improperly by "acting as collection agent for a party who does not even have a claim."  But, as discussed earlier, the claims of Mr. Callahan and the other three creditors listed on Schedule A/B were not extinguished in other litigation or by entry of Debtor's discharge.  11 U.S.C. § 524.  Entry of the discharge means only that the creditors cannot pursue such claims against the Debtor personally anymore.  *Id.*  They can, however, share pro rata in any amounts collected by the trustee after he "collect[s] and reduce[s] to money" property of the estate, including fraudulent transfers, for the benefit of all.  11 U.S.C. § 704(a)(1).

not of "substantially all" of the Debtor's property.  This factor does not weigh in favor or against a finding of fraudulent intent.

### (vi.)   <u>Reasonably Equivalent Value in Exchange for the Transfer</u>.

The Debtor allegedly executed the Promissory Note and Deed of Trust as consideration for amounts still owed the loans made to him by Ms. Coney in 2021, and also as consideration for the $10,000 loan made on January 27, 2022.  But, Ms. Coney was able to offer documentary evidence of only $28,896 in loans made in 2021, and the Debtor testified that, by the time he executed the Promissory Note and Deed of Trust, he had repaid $25,000 of that amount, leaving only $3,896 due at the time that he executed documents in the Home Loan Transaction.  To the extent that the $3,896.00 remained due to Ms. Coney, and to the extent that Ms. Coney provided the Debtor with the additional $10,000.00 on January 27, 2022, in exchange for the Promissory Note and Deed of Trust, such amount ($13,896) was not adequate consideration in exchange for the $45,000 Promissory Note secured by the Deed of Trust.  This factor is perhaps the most important factor in evaluating whether the transfer was fraudulent.

### (vii.)   <u>The Debtor's Insolvency at the Time of the Transfer</u>.

Section 101(32) defines the term "insolvent" to mean

> (A)   with reference to an entity other than a partnership and a municipality, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—
>
> > (i)   property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and
> >
> > (ii)   property that may be exempted from property of the estate under section 522 of this title;

11 U.S.C. 101(32).  The CUFTA definition is similar:

> (1)   A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.
>
> (2)   A debtor who is generally not paying his debts as they become due is presumed to be insolvent . . . .
>
> (4)   Assets under this section do not include property that has been transferred, concealed, or removed with intent to hinder, delay, or defraud creditors or that has

29

been transferred in a manner making the transfer
voidable under this article.

Per the Debtor's April 11, 2023 Amended Schedules, the Debtor had $0[13] in non-exempt assets (not including the $10,000 allegedly held by Ella Coney that was not scheduled)[14] and $504,179.75 in liabilities for debts incurred on or prior to January 27, 2022.  (*See* Ex. 66 at 1 and 13-17.)  According to the Debtor's schedules, he incurred all but one of these the debts[15] on or before January 27, 2022.  Thus, at the time of the Home Loan Transaction, the Debtor's debts were greater than all of his non-exempt assets.  Indeed, the entire reason that Ms. Coney made loans to the Debtor was because he did not have the funds to pay for all of his liabilities.  The Court, therefore, concludes that the Debtor was insolvent at the time of the Home Loan Transaction.[16] This factor weighs in favor of a finding of fraudulent intent.

### (viii.)  Conclusion:  The Home Loan Transaction was an Actual Fraudulent Transfer.

As discussed above, the majority of the factors that the Court is to consider in evaluating fraudulent intent weigh in favor of a finding of fraudulent intent.  In particular, the Court finds that the Debtor's insolvency, and his transfer through the Home Loan Transaction of the Deed of Trust to an insider for far less than the value he received in exchange show that that the Debtor acted with fraudulent intent in making the transfer.  Considered together, the evidence of badges of fraud demonstrates actual intent to hinder, delay, or defraud.  The Trustee has met his burden to avoid the Home Loan Transaction pursuant to Sections 548(a)(1)(A) and 544, and COLO. REV. STAT. § 38-8-105(1)(a).

### 2.  Claim to Avoid the Home Loan Transaction as Constructive Fraudulent Transfer.

The counterpart to "actual fraud" is "constructive fraud."  Constructive fraud connotes something less than actual fraud and does not require actual intent to defraud.  *See Neal v. Clark*, 95 U.S. 704, 706-07 (1877) (distinguishing between actual fraud and constructive fraud).  Instead, the statutory focus is on the debtor receiving less than reasonably equivalent value in exchange for the disputed transfer.  As with the actual fraud claims, the Trustee also bears the burden to prove the constructive fraud causes of action.

---

[13]     The Debtor claims $270,102.15 in assets, and claims exemptions totaling $295,975 in his amended schedules.  Thus, he claims to have $0 in non-exempt assets. With $0 in claimed non-exempt assets, the Debtor's liabilities clearly outweigh his debts.
[14]     The Court does not need to exclude alleged fraudulent transfers in the analysis, as those transfers would not further reduce the Debtors' $0.00 in assets for purposes of the insolvency evaluation.
[15]     Aside from the claim of Kendrick Legal Family Solutions, LLC, listed in Schedule E/F in the amount of $1,901.88 (Ex. 66 at 16), all of the debts in the Debtor's schedules were incurred on or prior to January 27, 2022, the date of the Home Loan Transaction.
[16]     The Debtor admitted as much to Mr. Gillette in his January 10, 2022 email.  (*See* Ex. 20) ("With your judgment, I, Patrick, am bankrupt.").

The Trustee asserts in the fourth claim for relief that the transfer effectuated through the Home Loan Transaction should be avoided pursuant to Section 548(a)(1)(B).  In his sixth claim for relief, the Trustee asserts that the same transfer should be avoided through use of the Trustee's "strong arm powers" under Section 544, combined with Colorado's "constructive fraud" statute:  COLO. REV. STAT. § 38-8-105(1)(b).

Section 548(a) provides, in relevant part:

> (1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> (B)
>
> > (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
> >
> > (ii)
> >
> > > (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
> > > (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
> > > (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
> > > (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

And Section 105(b) of the Colorado Uniform Transfer Act ("CUFTA") states:

> (1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:  . . .

31

(b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(I) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(II) Intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

COLO. REV. STAT. § 38-8-105(1)(a).

To prevail on a claim for constructive fraudulent transfer under either Section 548(a)(1)(B) or COLO. REV. STAT. § 38-8-105(1)(b) (with the Trustee creditor standing in the shoes of a hypothetical lien creditor under Section 544(b)), the Trustee must demonstrate:  "(1) that the debtor had an interest in property; (2) that a transfer of that interest occurred within [two years] of the filing of the bankruptcy petition; (3) that the debtor was insolvent or was rendered insolvent as a result of the transfer; and (4) that the debtor received less than a reasonably equivalent value in exchange for the transfer."  *Zubrod v. Keffer (In re Keffer)*, 307 B.R. 731, at *2 (10th Cir. BAP Mar. 26, 2004) (unpublished) (citing *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 535 (1994). *See also Walker v. Weinman (In re Adam Aircraft Indus., Inc.)*, 493 B.R. 834, 845 (Bankr. D. Colo. 2013) (similar).

As discussed above in connection with the Trustee's actual fraudulent transfer claim, the Trustee has demonstrated that:  (1) the Debtor had an interest in property; (2) that he transferred all or part of that interest within 2 years prior to the filing of the bankruptcy petition; and that (3) the Debtor was insolvent or was rendered insolvent as a result of the transfer.  The Trustee has also proved that the Debtor received less than a reasonably equivalent value in exchange for the Home Loan Transaction, as the Debtor executed a Promissory Note with a value of $45,000, notwithstanding the fact that he had already repaid Ms. Coney $25,000 of the $28,896 owed to her and that she loaned him only an additional $10,000.  The total amount outstanding, $13,896, was not reasonably equivalent value provided in exchange for a note with a value of $45,000.00 and a deed of trust securing such note.  Thus, the Trustee has demonstrated that the Home Loan Transaction was a constructively fraudulent transfer under both Section 548(a)(1)(B) and COLO. REV. STAT. § 38-8-105(1)(b).

3. **Ms. Coney Has Not Established a "Good Faith" Defense to the Claim to Avoid the Home Loan Transaction as an Actual Fraudulent Transfer.**

In her Amended Answer, Ms. Coney invokes the good faith defense of Section 548(c) and COLO. REV. STAT. § 38-8-109(1).  (Docket No. 28 ¶¶ 43-46.)  Further, in her post-trial briefing, Ms. Coney asserts, in a very general manner, that she "[e]ngaged in a

[g]ood [f]aith [t]ransaction," such that the transfers the Trustee seeks to avoid cannot be avoided under Section 548 and the CUFTA.  (Docket No. 96 at 18.)

Section 548(c) provides:

> Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

Similarly, COLO. REV. STAT. § 38-8-109(1) provides:  "A transfer or obligation is not voidable under section 38-8-105(1)(a) against a person that took in good faith and for a reasonably equivalent value given to the debtor or against a subsequent transferee or obligee."

The "good faith" defense under Section 548(c) is available to a transferee who received a transfer "for value and in good faith."  11 U.S.C. § 548(c); *45 John Lofts, LLC v. Meridian Cap. Grp., LLC (In re 45 John Lofts, LLC)*, 650 B.R. 602, 614-15 (Bankr. S.D.N.Y. 2024) (citing *Gowan v. Patriot Group, LLC (In re Dreier LLP)*, 452 B.R. 391, 425-26 (Bankr. S.D.N.Y. 2011)).  Similarly, the defense is available under COLO. REV. STAT. § 38-8-109(1) to a transferee who received a transfer "in good faith and for reasonably equivalent value."  "Under both the UFTA and Section 548(c) of the Bankruptcy Code, the transferee bears the burden of establishing good faith."  *Wagner v. Ultima Homes, Inc. (In re Vaughn Co., Realtors)*, 493 B.R. 597, 610 (Bankr. D. N.M. 2013).  *See also In re M & L Bus. Mach. Co.*, Inc., 84 F.3d 1330, 1338 (10th Cir.1996) ("Under § 548(c), [the transferee] has the burden of establishing good faith."); *45 John Lofts*, 650 B.R. at 615 (same).  *Cf. In re Jones*, 184 B.R. 377, 388 (Bankr. D.N.M. 1995) (holding that transferees bear the burden of proof under the New Mexico Uniform Fraudulent Transfer Act).  "Further, considering the similarities between Section 548(c) and the UFTA, "many courts have concluded that . . . the same [good faith] analysis applies under both laws*." Wagner*, 493 B.R. at 610 (citing *In re Tiger Petroleum Co.*, 319 B.R. 225, 232 (Bankr. N.D. Okla. 2004)).

> In the Tenth Circuit, "good faith under [Section] 548(c) should be measured objectively."  [*M & L Bus.*, 84 F.3d  at 1338.]  Determining whether a transferee has established good faith under Section 548(c) requires a two-part inquiry: the Court must determine whether the "circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose," and if so, whether "a diligent inquiry would have discovered the fraudulent purpose."  *Id.*

*Id.* (internal footnote omitted).  In applying the "reasonable person" standard, the Court must take into account the transferee's individual circumstances, including their

sophistication  and whether they had actual knowledge of the fraud.  *Id.* (citing *M & L Bus. Mach. Co.*, 84 F.3d at 1338-39).  It is a fact-intensive inquiry, as "[g]ood faith is not susceptible of precise definition and is determined on a case-by case basis."  *In re Armstrong*, 285 F.3d 1092, 1096 (8th Cir. 2002).

In invoking the good faith defense, Ms. Coney seems to argue that the Trustee failed to adduce evidence at trial regarding the badges of fraud.  (Docket No. 94 at 12.)  The Court rejects this contention.  As discussed above, there was substantial evidence about multiple badges of fraud from which the Court could, and has, concluded that the Debtor engaged in actual fraud.  Ms. Coney also suggests that she could not have acted in bad faith because she "knew (and knows) very little of her son's financial affairs and stays out of her son's financial affairs."  But, as discussed above, the "reasonable person" standard requires more than that.  In considering good faith, some courts consider factors such as:  (1) what the defendant knew; (2) whether the facts known by the transferee put the transferee on notice of the fraudulent purpose behind a transaction; and (3) whether diligent inquiry by the transferee would have uncovered the fraudulent purpose of the transfer.  *45 John Lofts*, 650 B.R. at 615.  In *Wagner*, the bankruptcy court applied the following the following factors:

> (1) the transferee's state of mind, including whether he or she had actual or inquiry knowledge of the fraudulent scheme; (2) whether the investor received exorbitant returns and/or was promised an interest rate greatly exceeding any standard market rates; (3) how the investor was enticed to make the investment, including how the investment was marketed; (4) whether the transfers occurred at arm's length, and more specifically, and how the investor became aware of or affiliated with the debtor; (5) the individual investor's education and sophistication; (6) the size of the investment; (7) any prior business dealings between the transferor and transferee, including whether the payment was late or made by any unusual method; and (8) whether there existed any other red flags that the investment may not be legitimate.

*Wagner*, 493 B.R. at 611.

In this case, the Court determines that the following factors should be taken into account:  (1) Ms. Coney's education and sophistication; (2) prior business dealings between the parties:  (3) Ms. Coney's state of mind, including whether she had actual or inquiry knowledge of the fraudulent purpose behind the transaction; (4) whether the transfer was at arm's length and the parties' relationship prior to the transfer; and (5) whether Ms. Coney provided adequate value in exchange for the transfer.

Ms. Coney is well-educated and, as a realtor, is quite familiar with the ins and outs of real estate transactions such as the Home Loan Transaction.  She was aware that the Debtor was struggling financially and, as his mother, agreed to help him.  In her prior dealings with the Debtor, Ms. Coney gave the Debtor gifts and made him loans based on mere promises to repay.  She did not document the transactions at all (aside

from keeping copies of cashier's checks) or require him to provide security for the loans. Indeed, it seems there was no need for security, as the Debtor repaid $25,000 of the $28,896 loaned to him by Ms. Coney within the same year.  It was only after the second judgment entered in favor of Mr. Callahan that Ms. Coney demanded that the Debtor provide her with security, in the form of the Deed of Trust, before she would agree to make him another loan.  The Court does not believe this is a mere coincidence.  To the contrary, Court believes and finds that Ms. Coney required the Debtor to sign the Promissory Note and Deed of Trust precisely because she had a general knowledge about his financial troubles, including the judgments,[17] and knew that, by doing so, the Debtor would both protect her claim and ensure that the previously unencumbered value of the Property was protected from the Debtor's creditors.[18]  The Court also finds that Ms. Coney knew that the Debtor had repaid her $25,000 such that the value provided in exchange for the Home Loan Transaction was substantially less than the value of the obligation incurred by the Debtor in signing the Promissory Note and Deed of Trust.

Based on such circumstances, the Court determines that the good faith defense is not available to Ms. Coney.  As a result, the Court determines that Trustee has demonstrated that the Home Loan Transaction must be avoided pursuant to Sections 548(a)(1)(B) and 544, and COLO. REV. STAT. § 38-8-105(1)(b), as a constructive fraudulent transfer.

### 4.   Claim to Avoid the Home Loan Transaction as a Preferential Transfer.

#### a.   The Home Loan Transaction was a Preferential Transfer.

In addition to his avoidance claims under the CUFTA and Section 548, the Trustee asserts that the Home Loan Transaction is a preferential transfer and thus should be avoided pursuant to Section 547(b).  When a debtor pays a creditor prior to filing bankruptcy, the Bankruptcy Code allows for the avoidance of such payments under certain circumstances as set forth in Section 547(b):

---

[17]    Even if Ms. Coney did not know all of the details of her son's financial troubles, she knew enough to be on inquiry notice that the signing of Trust could be fraudulent.  As many courts have recognized, the "mere absence of a diligent investigation in the face of unusual circumstances is enough to negate 'good faith'—regardless of whether a further investigation would have revealed anything."  *Geron v. Craig (In re Direct Access Partners, LLC)*, 602 B.R. 495, 551 (Bankr. S.D.N.Y. 2019) (quoting *Cuthill v. Greenmark, LLC (In re World Vision Ent., Inc.)*, 275 B.R. 641, 660-61 (Bankr. M.D. Fla. 2002)).  *See also 45 John Lofts*, 650 B.R. at 615 (collecting cases, including *Direct Access*).

[18]    The Debtor claimed in his Amended Schedule A/B that the value of the Property was $580,000 (Ex. 66.)  In the Debtor's Amended Schedule D, he stated that the Property was subject to a first lien held by Freedom Mortgage in the amount of $397,464.  (*Id.*)  At both the time of the Home Loan Transaction and at the time the Debtor filed for bankruptcy, Colorado's homestead exemption was $75,000.  COLO. REV. STAT. § 38-41-201 (2022).  Taking into consideration the homestead exemption, customary costs of sale (10%), and Mr. Callahan's judgment liens, there was at least $30,000 available for unsecured creditors at the time of the transaction.

> (b) Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
>
>> (1) to or for the benefit of a creditor;
>>
>> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>>
>> (3) made while the debtor was insolvent;
>>
>> (4) made—
>>
>>> (A) on or within 90 days before the date of the filing of the petition; or
>>>
>>> (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>>
>> (5) that enables such creditor to receive more than such creditor would receive if—
>>
>>> (A) the case were a case under chapter 7 of this title;
>>>
>>> (B) the transfer had not been made; and
>>>
>>> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

The burden is on the plaintiff to prove all elements of a preference. Section 547(g); *Rocin Liquidation Est. v. UPAC (In re Rocor Int'l, Inc.)*, 380 B.R. 567, 571 (10th Cir. BAP 2007). "All elements of Section 547(b) must be prove[d] before a transfer will be avoided. The absence of any one of the elements constituting a voidable preference negates the trustee's claim." *Gillman v. Sci. Rsch. Prods., Inc. of Del. (In re Mama D'Angelo, Inc.)*, 55 F.3d 552, 554 (10th Cir. 1995) (internal citations omitted).

As discussed in connection with the Section 548 claims, the Home Loan Transaction was a transfer of an interest of property of the Debtor. Thus, Section 547(b)(1) is met. Ms. Coney was a creditor of the Debtor at the time of the Home Loan Transaction – to the tune of $13,896. Thus, Section 547(b)(2) is met. The Debtor claims to have entered into the Home Loan Transaction on account of amounts he owed to the Debtor, which amounts constitute antecedent debt. Thus, Section 547(b)(3) is met. The Debtor was insolvent at the time of the Home Loan Transaction, since his liabilities exceeded the value of his assets. The Debtor was also presumed to be insolvent because the transfer occurred within 90 days prior to the Petition Date. 11 U.S.C. § 547(f). The Court also already has determined that the Debtor was insolvent. And the transfer effected by the Home Loan Transaction was made by the Debtor to Ms. Coney who, as his mother, is an insider. Thus, Section 547(b)(4)(A) is met. The Home Loan

Transaction occurred on January 27, 2022 – less than a year before the December 2, 2022 Petition Date.  Thus, Section 547(b)(4)(B) is met.

If the Home Loan Transaction is not avoided, Ms. Coney would be entitled to receive the full value of the $45,000-plus-interest Promissory Note and Deed of Trust, as a secured claim, rather than a pro rata share of the Debtor's estate, the non-exempt value of which he claims is $0.[19]  Thus, Section 547(b)(5) is met.  As such, the Trustee has met his burden to avoid the Home Loan Transaction under Section 547(b).

> ### b.  Ms. Coney Has Not Demonstrated that the Contemporaneous Exchange of New Value Defense Applies.

Section 547(c) excepts from avoidance certain transfers.  It provides:

> The trustee may not avoid under this section a transfer –
>
> (1) to the extent such transfer was –
>
>> (A)  intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
>>
>> (B)  in fact a substantially contemporaneous exchange.

New value is defined in Section 547 to mean

> money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation.

11 U.S.C. § 547(a)(2).

Ms. Coney raised the new value defense in her Amended Answer (Docket No. 28 ¶ 40) and makes mention of "new value" in her post-trial brief; however, Ms. Coney does not offer any argument in support of the application of the defense.  (*See* Docket Nos. 96 and 98).  Because Ms. Coney failed to present argument or analysis in support of her affirmative defense, Ms. Coney waived the defense.  *See Marck v. City of Aurora*, 2022 WL 889175, at *7 n.3 (D. Colo. Mar. 25, 2022) (holding that a party who raises an affirmative defense but does not engage in any analysis to support the defense waives it).  *See also In re Molycorp., Inc. Sec. Litig.*, 157 F. Supp. 3d 987, 1003 n.10 (D. Colo. 2016) (an argument "raised in a perfunctory manner" is deemed waived).  But even if Ms. Coney has not waived the defense, the evidence does not support it, as the new "value" provided by the Debtor in exchange for the Promissory Note and Deed of Trust

---

[19]  As discussed in footnote 18, the Court calculates the non-exempt value of the Debtor's estate prior to the Home Loan Transaction as exceeding $30,000 after payment of the lien of Freedom Mortgage and Mr. Callahan's judgment liens.

was only $10,000 – not "money's worth" for a $45,000 obligation.  As such, Ms. Coney has not established the applicability of the new value defense under Section 547(c)(1).

### c.   Ms. Coney Has Not Demonstrated that the Ordinary Course Defense Applies.

Section 547(c)(2) provides another defense to a preference claim.  *Weinman v. Dragul (In re Cornerstar Wine & Liquor, LLC)*, 650 B.R.583, 588 (Bankr. D. Colo. 2023).  A trustee may not avoid a transfer to the extent such transfer was incurred by the debtor in the ordinary course of the debtor's business, or such transfer was made in the ordinary course of business within the industry.  *Id.* (quoting statute).  The defense requires proof that (1) the Debtor incurred the debt in the ordinary course of business and *either* one of two possibilities:  (2) the Debtor made the transfer in the ordinary course of business that existed between the parties (a subjective test) *or* (3) the transfer was made in accordance with industry standards (an objective test)."  *Id.* (citing *Jubber v. SMC Elec. Prods., Inc. (In re C.W. Mining Co.),* 798 F.3d 983, 987 (10th Cir. 2015)).  Such defense is construed narrowly.  *Id.* (quoting *Jubber*, 798 F.3d at 987).  The defendant has the burden of establishing the ordinary course defense.  *Id.*

Ms. Coney raised the ordinary course defense in her Amended Answer (Docket No. 28 ¶ 41 and 42), and stated conclusorily in her post-trial brief that the "sums transferred . . . were ordinary course payments."  (Docket No. 96 at 3-4.)  However, Ms. Coney made no substantive argument that the Home Loan Transaction was an ordinary-course transaction in her closing arguments.  As a result, Ms. Coney has waived her claim that this affirmative defense applies.  *See Marck*, 2022 WL 889175, at * 7 n.3, *supra*, and *Molycorp*, 157 F. Supp. 3d at 1003 n.10, *supra*.

But even if she did not waive the defense, Ms. Coney failed to meet her burden at trial.  While the evidence shows that the Debtor regularly incurred debt from Ms. Coney, the evidence also shows that Ms. Coney never required the Debtor to provide security of any sort prior to the Home Loan Transaction.  No evidence was offered with respect to any sort of industry standard regarding such transfers.  As such, Ms. Coney has not established the elements required to invoke the ordinary course defense.  The Court, therefore, determines that the ordinary course defense does not except the transfer from avoidance.

### 5.   Conclusion Regarding Avoidance of the Home Loan Transfer.

Because the Trustee has met his burdens under Sections 547(b), 548(a)(1)(A) and (B), and 544, and COLO. REV. STAT. § 38-8-105(1)(a) and (b), and Ms. Coney has failed to establish her affirmative defenses, the Court rules that the Home Loan Transaction is avoided as a fraudulent transfer (both actual and constructive fraud) and as a preferential transfer.  Further, because the Court has determined that the Home Loan Transaction is avoided, the Trustee may recover such transfer, or the value thereof, for the benefit of the estate.  11 U.S.C. § 550.

C.      **Claim to Avoid the November 2022 Transfer.**

The Trustee seeks to avoid the Debtor's transfer to Ms. Coney of the $5,000.00 received from the November 29, 2022 Cash Advance (the "November 2022 Transfer") as a preferential transfer under Section 547(b) and/or as a fraudulent transfer under either Section 548(a)(1)(A) or (B) and CUFTA Sections 105(1)(a) or (b).

1.      **The November 2022 Transfer Was a Preferential Transfer.**

The Court incorporates by reference the standard for avoidance under Section 547(b) as set forth above.

The November 2022 was a transfer of an interest of property of the Debtor. Thus, Section 547(b)(1) is met.  And, on the date of such transfer, Ms. Coney was a Debtor of the creditor, who still owed her money on account of the Promissory Note and Deed of Trust.  Thus, Section 547(b)(2) is met.  However, the Debtor did not transfer the proceeds of the November 29, 2022 cash advance to Ms. Coney on account of the debt he owed her as of that date.  Instead, the evidence leads the Court to conclude that the Debtor gave Ms. Coney the $5,000.00 with the intent that Ms. Coney would hold it so he could use it for the Debtor's living expenses later.  Thus, the transfer was not made on account of antecedent debt.  Because the Trustee has not proved the Section 547(b)(3) element, the November 2022 Transfer is not avoidable under Section 547(b).

2.      **The Trustee November 2022 Transfer was an Actual Fraudulent Transfer.**

Again, to prevail on his claim for actual fraudulent transfer under either Section 548(a)(1)(A) or COLO. REV. STAT. § 38-8-105(1)(a) (with the Trustee standing in the shoes of a hypothetical lien creditor under Section 544(b)), the Trustee must show (i) a transfer of an interest of the Debtor in property; (ii) made within two years before the Debtor filed for bankruptcy; and (iii) done with "actual intent to hinder, delay, or defraud" a creditor.

There is no dispute that the first two elements of Section 548(a)(1)(A) are met: The cash advance proceeds were the Debtor's pre-petition property, and, the Debtor made the November 2022 Transfer just days before the Petition Date and well within the two-year statutory timeframe.  However, Ms. Coney argues that the Trustee cannot prove that the transfer was made with fraudulent intent.

But a number of the badges of fraud (set forth above and incorporated herein by reference) are present.  The November 2022 Transfer was to an insider, the Debtor's mother.  (Badge 1.)  The Debtor made the transfer to Ms. Coney with the intention and expectation that she would hold it for him to use at a later time, after the bankruptcy, so he effectively maintained control of the $5,000.00 after the transfer.  (Badge 2.)  The Debtor concealed the November 2022 Transfer by omitting mention of it from his Statement of Financial Affairs and schedules, by not documenting the transfer, and by providing the cash proceeds from the cash advance to his mother.  (Badges 3 and 7.)  The November 2022 Transfer occurred at a time when State Court Litigation remained

active for purposes of collection, and was of substantially all of his liquid cash assets. (Badges 4 and 5.)  Ms. Coney did not provide new value in exchange for the transfer at the time of the transfer.[20]  (Badge 6.)  And, the debtor was insolvent at the time of the November 2022 Transfer.  (Badge 7.)

The Debtor's conduct prior to the transfer is also evidence of fraudulent intent.  In particular, the Debtor's refusal to cooperate in discovery in the State Court Litigation and his use of the Dave Ramsey cash management system so as to evade record keeping strongly suggests that the Debtor intended to avoid providing a clear picture of his assets and financial transactions so as to avoid detection by his creditors and the Trustee.  And the Debtor's lack of transparency in his bankruptcy case, including his omission of Rocky Mountain as a creditor from his Amended Schedule D, his omission of the November 2022 Transfer to his mother in his Statement of Financial Affairs, and his omission of any mention of the $5,000.00 cash asset derived from the cash advance, are powerful evidence of fraudulent intent.  The Trustee has more than met his burden under actual fraudulent transfer under either Section 548(a)(1)(A) or COLO. REV. STAT. § 38-8-105(1)(a).

### 3.   Ms. Coney Has Not Established a "Good Faith" Defense to the Claim to Avoid the November 2022 Transfer as an Actual Fraudulent Transfer.

In her Amended Answer, Ms. Coney invokes the good faith defense of Section 548(c) or COLO. REV. STAT. § 38-8-109.  (Docket No. 28 ¶¶ 43-46.)  In addition, in her post-trial briefs, Ms. Coney asserts that she engaged in "a [g]ood [f]aith [t]ransaction" with her son with respect all transfers made such that they cannot be avoided under Section 548 or the CUFTA.  (Docket No. 96 at 18.)

The Court disagrees.  For the same reasons the Court found that the good faith defense did not shield the Home Loan Transaction from avoidance as an actual fraudulent transfer, the Court finds that the November 29, 2022 Transfer is not shielded.

### 4.   The November 2022 Transfer Was a Constructive Fraudulent Transfer.

The Court incorporates by reference the standard for a claim for constructive fraudulent transfer under either Section 548(a)(1)(B) or COLO. REV. STAT. § 38-8-105(1)(b) (with the Trustee creditor standing in the shoes of a hypothetical lien creditor under Section 544(b)), as stated above.

Again, there really is no dispute that the $5,000.00 derived from the November 29, 2022 cash advance constituted an interest in property, nor that the Debtor

---

[20]      To the extent that Ms. Coney asserts that the transfer was a payment made on account of debt owed to her, or that the Debtor transferred less than the full $5,000.00 to her, the Court is not persuaded. Instead, the Court credits the Debtor's testimony at the Section 341 meeting of creditors that he gave the $5,000 Ms. Coney to hold for him for future use or to "front the living expenses," as well as the Debtor's Section 341 meeting testimony that he gave her $5,000.00 on November 29, 2022.  The Court also credits Ms. Coney's deposition testimony that she received $5,000.00 from the Debtor on November 29, 2022, and discounts her later testimony that she received less than that amount.

transferred his interest in the cash advance proceeds within [two years] of the filing of the bankruptcy petition.  And, the Court has already determined that the Debtor was insolvent at the time of the transfer.  The Debtor did not receive any value in exchange for the transfer, as he intended for the Debtor to hold the money for him.  As such, the Trustee has demonstrated that the November 29, 2022 transfer should be avoided under Section 548(a)(1)(B) and COLO. REV. STAT. § 38-8-105(1)(b).

### 5. Conclusion Regarding Avoidance of the November 2022 Transfer.

Because the Trustee has met his burdens under Sections 548(a)(1)(A) and (B) and 544, and COLO. REV. STAT. § 38-8-105(1)(a) and (b), and because and Ms. Coney has failed to establish her affirmative defenses to such claims, the Court rules that the November 2022 Transfer is avoided as a preferential transfer.  Further, because the Court has determined that the November 2022 Transfer is avoided, the Trustee may recover such transfer, or the value thereof, for the benefit of the estate.  11 U.S.C. § 550.

### D. Claim to Avoid the December Transfer as an Unauthorized Post-Petition Transfer.

Section 549 provides:

> (a)    Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate—
>
> > (1)    that occurs after the commencement of the case; and
> >
> > (2)    (A) that is authorized only under section 303(f) or 542(c) of this title; or
> >
> > (B) that is not authorized under this title or by the court.

Under Section 549, the Trustee bears the burden of proving that (1) the transfer of the Property was a transfer of "property of the estate"; (2) the transfer occurred after the commencement of the bankruptcy case; and (3) the transfer was not authorized under the Bankruptcy Code or by the Court.  *Sender v. Love Funeral Home (In re Potter)*, 386 B.R. 306, 309-10 (Bankr. D. Colo. 2008).  However, "[a]ny entity asserting the validity of a postpetition transfer under § 549 has the burden of proof."  Fed. R. Bankr. P. 6001.  *See also In re Vitt*, 250 B.R. 711, 722 (Bankr. D. Colo. 2000) (noting burden).

Ms. Coney denies receipt of any property of the estate post-petition.  Though her argument is not particularly well developed, the Court understands Ms. Coney's argument to be that the $5,000.00 she acknowledges receiving from the Debtor on December 7, 2022 was proceeds of cash advance the Debtor received from Rocky Mountain on December 7, 2022, rather than proceeds from the December 1, 2022 cash advance.  However, as discussed earlier, the Court credits the Debtor's testimony at the

41

meeting of creditors that he gave the $5,000 from December 1, 2022 cash advance to his mother to hold rather than the Debtor's trial testimony that he used those funds to procure money orders that he used to pay other creditors.  Funds from the December 1, 2022 cash advance held for the Debtor's benefit constitute an "interest of the [D]ebtor in property as of the commencement of the case" and thus are "property of the estate" under Section 541(a)(1).  And Ms. Coney acknowledged in her deposition testimony that the Debtor transferred $5,000.00 to her on December 7, 2022.  (Ex. 44 at 162:2-4.) Notwithstanding the Debtor's testimony that he used the funds from the December 1, 2022 cash advance to obtain money orders to pay other bills (which the Court finds to be unsupported and self-serving), the Court finds it more likely than not that the $5,000.00 Ms. Coney received on December 7, 2022 was proceeds of the December 1, 2022 cash advance.  Finally, the December 2022 Transfer was not authorized by the Bankruptcy Code nor by this Court, and Ms. Coney did not make any argument that it was.

Because the Trustee has met his burden under Section 549, the December 2022 Transfer is avoided.  Further, because the Court has determined that the December 2022 Transfer is avoided, the Trustee may recover such transfer, or the value thereof, for the benefit of the estate.  11 U.S.C. § 550.

## E.    Preservation of Avoided Transfers is Automatic.

In the seventh claim for relief in the Complaint, the Trustee requested that the Court "enter judgment in his favor and against [Ms. Coney] to preserve any avoided transfer and/or avoided lien for the benefit of the Estate pursuant to 11 U.S.C. § 551." Section 551, entitled "Automatic preservation of avoided transfer, provides:  "Any transfer avoided under section . . . 544 . . . is preserved for the benefit of the estate but only with respect to property of the estate."

Avoidance of a transfer is a prerequisite for preservation under Section 551.  In this case, since the Trustee has met his burden to establish both kinds of alleged fraudulent transfers (actual fraud and constructive fraud) with respect to the Home Loan Transaction and November 2022 Transfer and to establish a post-petition transfer of estate property .  Since the Court has ordered avoidance of such transfers, the preservation of such transfers is automatic under Section 551.  *See Rodriguez v. DaimlerChrysler Fin. Servs. Ams., LLC (In re Bremer)*, 392 B.R. 873, 874 (Bankr. D. Colo. 2008) ("As a matter of law, a transfer avoided . . . is automatically preserved for the benefit of the estate under [Section] 551.").

## F.    Disallowance of Claim.

In his eighth claim for relief, the Trustee seeks disallowance pursuant to Section 502(d) of any claim filed by Ms. Coney.

Section 502(d) provides, in relevant part,

> [T]he court shall disallow any claim of any entity  . . . that is a transferee of a transfer avoidable under section . . . 544, . . .

> 547, 548, [or] 549 of this title, unless such entity or
> transferee has paid the amount, or turned over any such
> property, for which such entity or transferee is liable under
> section . . . 550 . . . of this title.

Under Section 502(d), disallowance of a claim of an entity whose claim has been avoided under Sections 544, 547, 548, and 549 must be disallowed.  Accordingly, the Trustee prevails on this claim.  Any claim Ms. Coney may assert against the Debtor's bankruptcy estate shall be disallowed.

## G.    <u>Damages for Avoided Fraudulent Transfers Under the CUFTA</u>.

In his Complaint and in his post-trial brief, the Trustee requests that the Court allow him to recover more than the value of the avoided transfers pursuant to Colorado law.  (Docket No. 1 ¶¶ 94 and 95; Docket No. 93 at 6-7.)  He asserts:

> Colorado's CUTFA allows creditors, including a trustee who
> steps into the shoes of a creditor, several remedies against a
> fraudulent transferee which include avoidance of the
> transfer, recovery of the value of the transfer, and if the
> transfer was done with actual intent, recovery of one and
> one-half times the transfer plus attorney fees, among other
> remedies.

(Docket No. 93 at 6-7.)   In support of this claim, the Trustee asserts COLO. REV. STAT. § 38-8-108(1).  In relevant part, Section 109(1) of the CUFTA provides, in relevant part:

> In an action for relief against a transfer or obligation under
> this article 8, a creditor . . . may obtain:
>  . . .
> (c) With respect to a transfer made or obligation incurred that
> is voidable under [COLO. REV. STAT. §] 38-8-105(1)(a), a
> judgment for one and one-half the value of the asset
> transferred or for one and one-half the amount necessary to
> satisfy the creditor's claim, whichever is less, together with
> the creditor's actual costs . . . .  A judgment may not be
> entered pursuant to this subsection (1)(c) against a person
> other than the debtor unless that person also acts with
> wrongful intent as defined in section 38-8-105(1)(a);
> otherwise, judgment for money damages against a person
> other than the debtor may be entered only as provided in
> [COLO. REV. STAT. §] 38-8-109.  A judgment may not be
> entered under this subsection (1)(c) unless a court of
> competent jurisdiction enters or has entered a judgment or
> order establishing the validity of the creditor's claim against
> the debtor.

Under Colo. Rev. Stat. § 38-8-108(1)(c), the Trustee's recovery may be multiplied only if he shows that "Ms. Coney also act[ed] with wrongful intent as defined in [Colo. Rev. Stat. §] 38-8-105(1)(a)" – *i.e.*, with "actual intent to hinder, delay, or defraud any creditor of the debtor.

In his post-trial brief, the Trustee made no argument to support a contention that Ms. Coney, rather than the Debtor, acted with fraudulent intent with respect to any of the avoided transfers. As such, the Trustee has waived his claim for multiplied recovery. *See In re Molycorp., Inc. Sec. Litig.*, 157 F. Supp. 3d 987, 1003 n.10 (D. Colo. 2016) (an argument "raised in a perfunctory manner" is deemed waived). And besides, the Court did not receive sufficient direct evidence of Ms. Coney's acting with specific fraudulent intent. The Court, therefore, denies the request for a damages multiplier.

## VI.    Conclusion and Order.

For the reasons set forth above, the Court, it is

ORDERED that:

1.    Judgment shall enter in favor of the Trustee and against Ms. Coney on the Trustee's claims to avoid the Home Loan Transaction pursuant to Sections 547(b), 548(a)(1)(A) and (B), and 544, as well as Colo. Rev. Stat. § 38-8-105(1)(a) and (b).

2.    Judgment shall enter in favor of Ms. Coney and against the Trustee on the Trustee's claim to avoid the November 2022 Transfer pursuant to Section 547(b).

3.    Judgment shall enter in favor of the Trustee and against Ms. Coney on the Trustee's claim to avoid the November 2022 Transfer pursuant to Sections 547(b), 548(a)(1)(A) and (B), and 544, as well as Colo. Rev. Stat. § 38-8-105(1)(a) and (b).

4.    Judgment shall enter in favor of the Trustee and against Ms. Coney on the Trustee's claim to avoid the December 2022 Transfer pursuant to Section 549.

5.    Pursuant to Section 550, the Trustee is entitled to recover the value of the Home Loan Transaction, the November 2022 Transfer, and the December 2022 Transfer. Accordingly, judgment shall enter in favor of the Trustee in the amounts of $45,000; $5,000, and $5,000 respectively.

6.    Pursuant to Section 551, the avoided Home Loan Transaction, November 2022 Transfer, and December 2022 Transfer are preserved for the benefit of the estate.

7.    Judgment shall enter in favor of the Trustee and against Ms. Coney on the Trustee's claim pursuant to Section 502(d).  Any claim that Ms. Coney may make against the Debtor's bankruptcy estate shall be DISALLOWED.

DATED this 25th day of August, 2025.

BY THE COURT:

Thomas B. McNamara
United States Bankruptcy Judge